*Decision will be entered under Rule 155.*

JAMES VERNON TRUESDELL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JAMES AND LINDA TRUESDELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 28176-84, 28177-84.     Filed December 30, 1987.

James Vernon Truesdell, pro se.
*Lenore Lambert* and *Karl Zufelt,* for the respondent.

NIMS, *Judge:* In his statutory notices of deficiency, respondent determined the following deficiencies in petitioners' income tax and additions to tax for the following taxable years:

| Year | Deficiency | Additions to tax sec. 6653(b) [1] |
|------|-----------|-----------------------------------|
| 1977 | $4,736.25 | $2,368.13 |
| 1978 | 8,472.54 | 4,236.27 |
| 1979 | 26,678.44 | 13,339.22 |

In his amended answers respondent redetermined deficiencies in petitioners' income tax and additions to tax for the 1977 and 1978 taxable years as follows:

| Year | Deficiency | Additions to tax sec. 6653(b) |
|------|-----------|-------------------------------|
| 1977 | $6,424.09 | $3,212.05 |
| 1978 | 18,969.90 | 9,484.95 |

Respondent's redetermination increased the deficiencies for 1977 and 1978 in the amounts of $1,687.84 and $10,497.36, respectively, and increased additions to tax for those years in the respective amounts of $843.92 and $5,248.68.

Respondent has conceded that the deficiency for the taxable year 1979 is $18,925.18 and asserts that the addition to tax for that year is $9,462.59. This concession decreases the deficiency by $7,753.26 and the addition to tax by $3,876.63 for the taxable year 1979.

---

[1] Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

On the first two pages of his statutory notice in docket No. 28177-84 for the taxable years 1978 and 1979, respondent indicated that the additions to tax for those years were determined pursuant to sec. 6653(a). However, on the third page of his statutory notice, respondent stated:

"It is determined that the underpayment of tax required to be shown on your returns for the taxable years 1978 and 1979 is due to fraud. Consequently, the 50 percent addition to tax as provided by section 6653(b) of the Internal Revenue Code is asserted for those years."

In addition, respondent has made affirmative allegations of fraud in his answers and amended answers. Thus, the additions to tax have been determined under sec. 6653(b), as to which respondent bears the burden of proof. Rule 142(b).

Petitioner James Truesdell filed a Federal income tax return for the taxable year 1977 listing himself as an unmarried head of household. Petitioners James and Linda Truesdell filed joint Federal income tax returns for the taxable years 1978 and 1979. Hereinafter James Truesdell will be referred to as petitioner, and Linda Truesdell will be referred to as Linda.

Respondent issued a statutory notice of deficiency to petitioner for the taxable year 1977 and a statutory notice of deficiency to petitioner and Linda for the taxable years 1978 and 1979. These cases have been consolidated for the purposes of trial, briefing, and opinion.

Linda did not appear at trial in person, nor was she represented by counsel. Accordingly, this Court will grant respondent's oral motion to dismiss the case as to Linda for failure to properly prosecute and to establish the deficiency due from her at the amount due from petitioner for the taxable years 1978 and 1979. An order will be issued to reflect the granting of this motion. Respondent has conceded that Linda is not liable for additions to tax under section 6653(b).

After concessions, the issues for decision are: (1) Whether petitioner failed to report $22,231.86 in taxable income for the taxable year 1977; (2) whether petitioner and Linda failed to report $46,083.48 and $45,659.71 in taxable income for the taxable years 1978 and 1979, respectively; and (3) whether the resulting deficiencies are due to fraud.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner and Linda were residents of California at the time the petitions in this case were filed.

During the taxable years 1977 and 1978, petitioner was the president and sole shareholder of Asphalt Patch Co., Inc. (hereinafter referred to as Asphalt Patch). The corporation filed Federal income tax returns for the taxable years ending March 31, 1978, and March 31, 1979. Asphalt Patch ceased operating in 1979

On January 1, 1979, Jim T. Enterprises, Inc. (hereinafter referred to as Jim T. Enterprises), was incorporated. Petitioner's son, Robert Truesdell (hereinafter referred to as Robert), was named president of the corporation. In 1979 Robert was the sole shareholder of Jim T. Enterprises. Robert was 17 years old in 1979 and was claimed as a dependent on petitioners' income tax return for that year. Petitioner has conceded that although Robert was the record shareholder of Jim T. Enterprises, petitioner was actually the sole shareholder of the corporation.

Petitioner purchased two flower shops. One flower shop, known as Flowers By Eleanor, was purchased, as an ongoing business, from Eleanor Humphrey on December 1, 1978. Title was taken in the name of Asphalt Patch. However, no mention of the ownership of this flower shop appears on the corporation's Federal income tax returns or on its books.

The second shop, Jim T. Florist & Photographic Shoppe, was established in a building owned by Vern Forbes on San Bernadino Road in Covina, California. With petitioner's knowledge, Kenneth Peterson filed a fictitious business name statement stating that Jim T. Florist & Photographic Shoppe located on San Bernadino Road was a general partnership owned by petitioner and Kenneth Peterson, Sr. Petitioner and Peterson applied to subscribe to the American Floral Service as owners of Jim T. Florist & Photographic Shoppe. Petitioner and Peterson in their individual capacities both signed an application for membership in Teleflora.

Jim T. Florist & Photographic Shoppe conducted business in 1978. During that period, expenses for the shop totaled $22,900. Sales from the shop as listed in sales journals presented to Revenue Agent Joseph R. Coscarelli totaled $12,963.

Petitioner was corporate secretary and general manager of Jim T. Enterprises. Jim T. Enterprises filed a Federal income tax return for the calendar year 1979.

Asphalt Patch engaged in three lines of business: asphalt bagging, trucking or hauling, and installing asphalt paving. Jim T. Enterprises engaged in the same three lines of business.

Petitioner directed and controlled the activities of Asphalt Patch and Jim T. Enterprises. Petitioner and his son were the only persons authorized to sign corporate checks. Petitioner authorized all corporate bank deposits.

Petitioner arranged all the deliveries of bagged asphalt and supervised the recording and billing of bagged asphalt sales for both corporations. Checks received in payment for bagged asphalt sales were placed on petitioner's desk.

Petitioner also managed all the trucking work, keeping all the records relating to the trucking aspects of the business of the corporations and handling all the billing for trucking work. All checks received in payment for trucking work were placed on petitioner's desk.

The asphalt bagging business was the primary business of both corporations. Purchasers who contracted for large quantities of bagged asphalt used charge accounts. An order for bagged asphalt was written on an invoice that was later sent as a bill to the customer. Payments received for bagged asphalt were recorded in a ledger book by invoice number, number of bags sold, and amount of payment received.

Some of the invoices were numbered, and some were not. Customers who purchased bagged asphalt "off the street" would pay cash and take the materials with them. "Off the street" purchases were recorded on unnumbered invoices. Unnumbered invoices were placed on petitioner's desk.

Trucking customers placed orders by telephone. Trucking work was not recorded on invoices. Unnumbered bills were sent to trucking customers. Petitioner handled all the billing for trucking work and kept the trucking records himself.

Petitioner had a special book in which he recorded trucking income. It was necessary to keep records of trucking income so that they would be available to the various trucking broker-customers and their bookkeepers. Nevertheless, paperwork relating to trucking work was frequently thrown away.

Paving job inquiries were received by telephone, recorded in a telephone logbook, and referred to an estimator. Kenneth Lyndes estimated many of the corporations' paving jobs. Lyndes wrote estimates for paving jobs on Asphalt Patch forms and on his own forms, stamped

"Payable to Jim T. Enterprises." These forms were given to petitioner. The estimate forms were not numbered.

Petitioner personally supervised the paving work. Because paving customers usually paid petitioner upon completion of the job, they usually were not billed. Petitioner frequently threw the contract away after a customer paid for a paving job.

Kenneth Peterson was employed by Asphalt Patch and Jim T. Enterprises from February 1978, until June or July 1980. He was paid $200 per week. Peterson's duties included writing checks on the corporate account at petitioner's direction.

Asphalt Patch maintained checking account number 03-00828-9 from October 19, 1976, until April 3, 1978, and checking account number 03-01007-7 from April 3, 1978, until April 24, 1979, at the Brea, California, office of the National Bank of Whittier. Jim T. Enterprises maintained checking account number 453-01076-4 at the Brea, California, office of the National Bank of Whittier from October 19, 1978, until April 27, 1982. Only petitioner and Robert were authorized to sign checks or withdraw funds from these three corporate accounts.

During the years in issue, petitioner used corporate funds for personal expenditures or deposited checks made payable to Asphalt Patch or Jim T. Enterprises into his personal checking and savings accounts. During the calendar year 1977, petitioner deposited checks totaling $10,530.78 made payable to Asphalt Patch into his personal checking account at the Brea office of the National Bank of Whittier and deposited checks totaling $1,244.50 made payable to Asphalt Patch into his personal savings account at Crocker National Bank in Covina, California. These checks were drawn in payment for paving and trucking work done by the corporation.

During the calendar year 1977, petitioner endorsed and cashed or deposited into a personal account $7,231.63 worth of checks made payable to Asphalt Patch in payment for trucking and paving work performed by the corporation.

In 1977, Andrew and Cindy Pouastrini issued two checks totaling $2,250 for paving work performed by Asphalt Patch at Rosevilla Mobile Court, 1329 West Mission

Boulevard. Petitioner deposited these checks into his personal checking and savings accounts.

Vern Forbes rented a store to Jim T. Florist & Photographic Shoppe. Forbes cashed some checks payable to Asphalt Patch or Jim T. Enterprises at the request of petitioner or Kenneth Peterson. The proceeds of these checks were applied to the rent due on the florist shop, and any amount in excess of the rent due was returned to petitioner or Peterson in cash.

In 1977, petitioner and Forbes endorsed a check issued to Asphalt Patch by Lucas Specialty Rock & Sand Co. (hereinafter referred to as Lucas Rock) for $750. During 1977, petitioner cashed two checks totaling $224.95 issued to Asphalt Patch by Lucas Rock.

During 1978, petitioner deposited into his personal checking accounts checks totaling $1,787.45 issued to Asphalt Patch in payment for paving and trucking work. In the same year, petitioner deposited into a joint savings account in his name and in the name of Robert Truesdell checks totaling $7,980 issued to Asphalt Patch. During 1978, petitioner cashed or deposited into his personal accounts checks totaling $19,113.93 issued to Asphalt Patch in payment for paving and trucking work.

In 1978, Peterson cashed checks totaling $7,091.85 issued to Asphalt Patch in payment for paving and trucking work. Peterson cashed these checks at petitioner's direction and gave the proceeds to petitioner.

In 1978, petitioner deposited a check in the amount of $451.20 issued by Lucas Rock to Asphalt Patch into the account of Jim T. Florist. In February 1978, Lucas Rock issued a check in the amount of $353.35 to Asphalt Patch that was endorsed by petitioner and F.J. Timmel. In the same year, petitioner deposited into a personal account a check in the amount of $100 issued to Asphalt Patch by Victor P. Aprea.

During 1978, petitioner and Vern Forbes endorsed checks issued to Asphalt Patch in payment for paving and trucking work totaling $3,353. Proceeds of checks endorsed by Vern Forbes were applied to rent owed by Jim T. Florist & Photographic Shoppe or given to petitioner.

During 1979, petitioner deposited checks totaling $3,460.12 issued to Jim T. Enterprises for paving and trucking work into his personal checking account at the Brea, California, branch of the National Bank of Whittier. In the same year, petitioner cashed or deposited into a personal account checks totaling $17,325.26 issued to Jim T. Enterprises for paving and trucking work and deposited into his personal checking account a check in the amount of $255 issued to Asphalt Patch.

In 1979, at petitioner's direction, Peterson cashed checks totaling $8,688.21 made payable to Jim T. Enterprises. Peterson cashed these checks at the Brea branch of the National Bank of Whittier and gave the proceeds to petitioner.

Petitioner exercised complete control over all the paving jobs done by the corporation. Customers paid for paving work by making a partial payment before the work began and then by paying in cash or by check upon completion of the job. In 1979, Harry Fleming gave Peterson $560 in cash as payment for paving work done pursuant to a contract with Jim T. Enterprises. In 1979, petitioner deposited into a joint savings account, in his name and in the name of Robert Truesdell, a check in the amount of $500 issued by Industry Realty for paving work.

In the same year, petitioner cashed a check in the amount of $9,662.40 issued by Forest City Dillon-Tecon Pacific to Jim T. Enterprises for paving work. At petitioner's first meeting with Internal Revenue Special Agent Grant Hovey on June 23, 1980, the agent asked petitioner whether his company had done any work for Forest City Dillon-Tecon Pacific. Approximately 1 month later, on July 21, 1980, Jim T. Enterprises filed an amended return, declaring additional income of $9,760 from this source. The larger sum appearing on the amended return did not reflect the subtraction by Forest City Dillon-Tecon Pacific of a discount of 1 percent ($97) from the invoiced amount before issuing the check.

During 1979, petitioner cashed or deposited into a personal account four checks totaling $3,004.50 made payable to the Kenneth Lyndes Paving Co. Kenneth Lyndes estimated asphalt paving jobs and driveway sealing jobs for

Jim T. Enterprises. Lyndes received a 10-percent commission when the bids for the jobs he estimated for Jim T. Enterprises were accepted. When a check for a paving job done by Jim T. Enterprises was made payable to Kenneth Lyndes Paving Co., Lyndes would cash the check and pay petitioner what he owed him.

In 1979, petitioner and Vern Forbes endorsed two checks totaling $779.22 issued to Jim T. Enterprises for paving and trucking work.

Petitioner did not report as income on his individual Federal income tax returns for the taxable years 1977, 1978, and 1979 any of the checks issued to Asphalt Patch or Jim T. Enterprises that were cashed or deposited into petitioner's personal accounts.

In July 1978, Lawson & Valley, Inc., auctioneers, issued a check to Asphalt Patch in the amount of $11,852.70 in payment for equipment sold on behalf of Asphalt Patch. On July 5, 1978, petitioner negotiated this check, depositing $6,000 into the corporate account of Asphalt Patch and retaining $5,852.70 in cash for himself. The $5,852.70 in cash was not reflected on petitioner's individual Federal income tax return for the taxable year 1978.

During the calendar year 1979, Jim T. Enterprises paid $1,425 in bonuses to petitioner. The corporation deducted this payment as wages on its income tax return for the taxable year 1979. Petitioner did not include this amount as income on his joint income tax return for the taxable year 1979.

Petitioner often bought and sold automobiles, trucks, and equipment at a profit. He made frequent purchases of equipment at auction for resale. Profit from these sales of vehicles and equipment was not reported as income on petitioner's income tax returns for the years in issue.

One such transaction was the purchase of a truck from Ortho Ira Cockrell that petitioner sold on the same day, realizing a profit for himself of approximately $12,000. The certificate of ownership of the truck was never filed in petitioner's name. The entire transaction was carried out in cash. Petitioner paid Cockrell cash for the truck. The buyer cashed a check at petitioner's bank and gave Peterson $29,000 in cash, and Peterson gave the money to petitioner.

Asphalt Patch employed Moard Business Service (hereinafter referred to as Moard) to maintain a general ledger for the corporation in 1977. Paul Zeh was the owner of Moard. Petitioner, like other clients of Moard, provided the bookkeeping service with records for use in preparing the ledger.

Debby Peabody prepared Asphalt Patch's ledger under the direction of Zeh. Sometime after Zeh's death, Peabody was employed by petitioner to keep the ledger. Petitioner or someone in his office would provide Peabody with check stubs, deposit stubs, and sales journals from which she kept the ledger.

It was Peabody's practice, both before and after Zeh's death, to prepare a record of cash disbursements for the ledger at the same time she prepared a record of cash received. Peabody prepared a record of checks drawn on Asphalt Patch for the taxable year ended March 31, 1978, and a record of cash received by Asphalt Patch for the taxable year ended March 31, 1979. Petitioner gave these records to Special Agent Hovey pursuant to summons. Petitioner produced no record of checks drawn on Asphalt Patch for January, February, or March 1978.

Peabody prepared a record of checks drawn on Asphalt Patch for the months of July 1978, through December 1978, and a record of cash received for the months of July 1978, through October 1978. These records were submitted to Special Agent Hovey by petitioner. The record of cash received presented to Hovey contained no entries for November and December 1978.

The record of cash received in July, August, September, and October 1978, shows only totals; it does not list the names of each payor as prior records of cash received had. Peabody prepared these entries without a list of payors because she was shown only totals, and not the sales journal.

Kenneth Peterson prepared some of the sales summaries, or sales journals, listing income from sales of bagged asphalt for the years 1978 and 1979. These sales records were given to the bookkeeper for use in preparing the "record of cash received" entry in the ledger.

Moard Bookkeeping Service, and later, Peabody, returned all sales journals of Asphalt Patch to petitioner after

preparation of the ledger entries. The sales summaries of Asphalt Patch for the calendar years 1977 and 1978 were recopied by petitioner's stepdaughter, at his direction, in preparation for audit by the State of California.

Peabody worked on an account entitled "Notes Payable, James Truesdell." The last sum in the "balance" column of this document is $30,645.68, showing that on October 31, 1977, Asphalt Patch owed petitioner $30,645.68. Peabody was not told that any of the income of Asphalt Patch was not deposited into the corporate account. She did not know that some items of corporate income were not recorded on the corporation's books.

Edward Brown prepared the corporate income tax return for Asphalt Patch for the taxable year ended March 31, 1978. Brown obtained information for the return from Asphalt Patch's general ledger that he obtained from Moard Bookkeeping Service. Brown did not know that all corporate income of Asphalt Patch was not reflected through the corporate ledger.

Petitioner hired Alexander Kozloff in early 1979 to keep the financial records of Jim T. Enterprises and to prepare income tax returns for the corporation and for petitioner. Kozloff maintained an account entitled "Notes Payable-Truesdell." The first entry for 1979 shows a carryover balance from 1978 of $87,299.01.

Kozloff recorded all the information he received regarding payments to the corporation. Kozloff was never told that Asphalt Patch or Jim T. Enterprises had income that was not deposited into the corporate bank account. Kozloff often received information regarding purchases of corporate assets long after the purchase.

At his first meeting with Special Agent Hovey, petitioner told the agent that his corporation ceased paving work in 1978, that income from paving jobs had been recorded on invoices, and that he supposed that all of Asphalt Patch's income had been declared on its corporate returns.

Hovey later served summonses on petitioner for records of Asphalt Patch, including articles of incorporation, bank records, delivery receipts, sales invoices and contracts, and also served a summons on Alexander Kozloff, the bookkeeper and accountant of the corporation, requesting the

same records. Kozloff told the agent that he had given the records of Asphalt Patch to petitioner.

On August 7, 1980, petitioner met with Hovey and produced the incorporation documents, corporate minutes, bank statements, canceled checks, packages of invoices, and a list that purported to be the sales journals of those invoices. Petitioner also produced a post binder of Asphalt Patch containing general journals, subsidiary journals, and payroll information. Petitioner did not produce the paving job contracts that had been requested in the summons.

Hovey was unable to reconcile all the sales figures in the post binder of Asphalt Patch that had been provided by petitioner. The post binder was looseleaf, and its pages were not numbered consecutively. Hovey could not determine whether entries were missing or pages had been removed. Hovey copied the records he received from petitioner and returned them to petitioner's attorney.

Later Hovey served a summons on petitioner requesting the records of Jim T. Enterprises. Hovey received the records and copied them at petitioner's office. Hovey also went to Kozloff's office and made copies of the general ledger and post binder of Jim T. Enterprises that were in Kozloff's possession.

The summons Hovey served on petitioner requested records of paving contracts and trucking statements of Jim T. Enterprises. Petitioner failed to produce these records.

Petitioner voluntarily showed Hovey invoices that he said were included on the amended corporate return of Jim T. Enterprises. Petitioner explained that these invoices had not been included on the original return because the invoices had been stolen during a burglary. Petitioner did not explain, however, why these invoices were not numbered.

Hovey also served summonses on banks to obtain records of the corporations' bank accounts and petitioner's personal bank accounts. Petitioner wrote to the banks requesting them not to comply with the summons. Hovey received the bank records only after obtaining a court order mandating that the bank records and corporate records that had been requested in the summons be produced.

After obtaining the court order, Hovey met again with petitioner and his attorney. However, petitioner still did not produce the proposal and contract forms for paving work or the statements for trucking work that had been requested in the summons. Petitioner kept a record of trucking work and understood the importance of keeping such records.

### ULTIMATE FINDINGS OF FACT

Petitioner controlled the activities of Asphalt Patch and Jim T. Enterprises. Although most of the income from the corporations' sales of bagged asphalt was accurately recorded on the books and reported on the tax returns of the corporations, income from trucking and paving work was not accurately recorded on the books or reported on the tax returns of the corporations for the years in issue. Petitioner kept records of trucking and paving work in such a manner that the corporations' bookkeepers and accountants were unaware of much of the income from trucking and paving.

During the years 1977 and 1978, petitioner diverted to himself $22,231.86 and $46,083.48, respectively, from the income of Asphalt Patch. During the year 1979, petitioner diverted to himself $44,234.71 from income of Jim T. Enterprises. This diverted income was not recorded on the corporations' books nor reported on the corporations' income tax returns. Nor was it reported as income on petitioner's income tax returns for the years in issue.

Petitioner also failed to report income from sales of bagged asphalt to "off the street" customers. Bonuses of $1,425 paid to petitioner in 1979 were not reported as income on petitioner's income tax return for that year.

### OPINION

As a preliminary matter, we note that although petitioner bears the burden of proof as to the underlying income tax deficiencies determined in the notices of deficiency (Rule 142(a)), respondent bears the burden of proof as to the additions to tax for fraud under section 6653(b). Sec. 7454(a); Rule 142(b). Respondent also bears the burden of proof as to the increases in the income tax deficiencies and additions to tax asserted in his amended answers. Rule

142(a). Respondent's concessions as to the deficiency and addition to tax for the taxable year 1979 do not relieve petitioner of his burden of proof or place any burden on respondent. *Silverman v. Commissioner,* 538 F.2d 927 (2d Cir. 1976); *Gobins v. Commissioner,* 18 T.C. 1159, 1168-1169 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954)

## Diverted Income

Respondent takes the position that the entire amounts diverted by petitioner from Asphalt Patch and Jim T. Enterprises during the taxable years 1977 and 1978 are includable in petitioner's income. Petitioner argues that he did not divert any corporate funds to his own use. However, petitioner also maintains that if this Court finds that he did divert corporate funds to his own use, the diverted funds constitute constructive dividends to petitioner and, therefore, the amounts includable in his income are limited to the earnings and profits of the corporations during the years in issue.

Petitioner contends that the amounts he diverted from Asphalt Patch and Jim T. Enterprises during the years in issue were used to pay corporate expenses and were not used for petitioner's personal expenses. Petitioner asserts that some of the funds diverted to himself from the corporations were spent on the operation of two flower shops and that expenditures for the flower shops somehow conferred a benefit upon the corporations.

The evidence does not support this assertion. Petitioner and Peterson operated a business called Jim T. Florist & Photographic Shoppe from August until December 1978. Jim T. Florist & Photographic Shoppe was a partnership owned by petitioner and Peterson. Jim T. Florist & Photographic Shoppe was not an asset of either Asphalt Patch or Jim T. Enterprises. Accordingly, any expenditures made by the corporations on behalf of Jim T. Florist & Photographic Shoppe inured to the benefit of petitioner and Peterson and not to the benefit of petitioner's corporations.

Petitioner introduced into evidence a document indicating that on December 1, 1978, Asphalt Patch acquired title to a shop called Flowers by Eleanor for the sum of $10,000. However, no evidence was presented to show how this sum

was paid or that it was actually paid. There is no mention of this purchase in the records of Asphalt Patch or on its income tax return. Moreover, petitioner has produced no evidence from which we can determine how much was spent by Asphalt Patch to keep Flowers by Eleanor in business.

Approximately 3 months after Flowers by Eleanor was purchased, petitioner decided to leave the flower business. Accounts of his departure from the business vary. Petitioner testified that he obtained a hammer, demolished the contents and fixtures of both stores, and hauled them to the dump. Peterson testified that petitioner first notified the florists in the area that he was going out of business, moved all the salable items to one shop, sold fixtures and supplies from both stores, pocketed the proceeds, and then destroyed the nonsalable items and took them to the dump. It is impossible to determine whether petitioner left the flower business with more, less, or approximately the same amount of money that he brought to it.

The flower shops were never treated as corporate assets. There is no mention of them in the corporate records. When the businesses were terminated, disposal of the assets was not conducted in a manner that benefited the corporations. Accordingly, we find that neither of the flower shops was a corporate asset. Any expenditures on behalf of the shops did not benefit petitioner's corporations.

Petitioner's most cogent argument, however, is that the funds he diverted constitute constructive dividends to him, and, therefore, are taxable as income to him only to the extent of the earnings and profits of the corporations. Under sections 301(c)[2] and 316(a),[3] dividends are taxable to

---

[2]Sec. 301(c) provides, in pertinent part:

SEC. 301(c). AMOUNT TAXABLE.—In the case of a distribution [of property made by a corporation to a shareholder with respect to its stock]—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

(2) AMOUNT APPLIED AGAINST BASIS.—That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

(3) AMOUNT IN EXCESS OF BASIS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as a gain from the sale or exchange of property.

[3]Sec. 316(a) provides:

SEC. 316(a). GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

the shareholder as ordinary income to the extent of the earnings and profits of the corporation, and any amount received by the shareholder in excess of earnings and profits is considered as a nontaxable return of capital to the extent of the shareholder's basis in his stock. Any amount received in excess of both the earnings and profits of the corporation and the shareholder's basis in his stock is treated as gain from the sale or exchange of property.

Dividends may be formally declared or they may be constructive. The fact that no dividends are formally declared does not foreclose the finding of a dividend-in-fact. *Noble v. Commissioner*, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84. The crucial concept in a finding that there is a constructive dividend is that the corporation has conferred a benefit on the shareholder in order to distribute available earnings and profits without expectation of repayment. *Noble v. Commissioner*, 368 F.2d at 443. We find that the diverted funds in this case constitute constructive dividends to petitioner.

Respondent, himself, determined that the earnings and profits of Asphalt Patch were $23,540 and $4,594 in the taxable years 1978 and 1979, respectively, and that the earnings and profits of Jim T. Enterprises were $16,127.69 in the taxable year 1979. Petitioner failed to introduce any evidence that the earnings and profits of either corporation for any of the years in issue were less than the amounts determined by respondent. Accordingly, we find that the earnings and profits of Asphalt Patch were $23,540 and $4,594 in the taxable years 1978 and 1979, respectively, and that the earnings and profits of Jim T. Enterprises were $16,127.69 in the taxable year 1979.

Because neither party introduced evidence as to the earnings and profits of Asphalt Patch for the taxable year 1977, petitioner has failed his burden of proving that there

---

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

were not sufficient earnings and profits to support the deficiency determined in respondent's notice of deficiency for that year. However, respondent has failed his burden of proving that Asphalt Patch had sufficient earnings and profits to support the increase in deficiency for that year asserted in his amended answers.

Respondent has failed to prove that the earnings and profits of the corporations were sufficient to permit the full amount of the funds diverted by petitioner during the taxable years 1977 and 1978 to be taxed as ordinary income under a constructive dividend theory. Deficiencies in excess of the earnings and profits of the corporations were asserted in respondent's amended answers. Respondent bears the burden of proving the amounts in excess of the deficiencies determined in the notices of deficiency. Rule 142(a). Respondent maintains, nevertheless, that it is unnecessary to characterize the diverted funds as constructive dividends and that, therefore, the full amount diverted is taxable to petitioner as ordinary income.[4]

Respondent does not attempt to describe the diverted funds as additional salary, illicit bonuses, commissions, or anything more than diversions. Instead, respondent argues that any diversions from a corporation by its sole shareholder are taxable to the shareholder as ordinary income.

Respondent relies on *Leaf v. Commissioner*, 33 T.C. 1093 (1960), affd. per curiam 295 F.2d 503 (6th Cir. 1961), in which we held that the taxpayer, who unlawfully had diverted funds from his insolvent corporation with the intention of defrauding creditors, was liable for taxes on the full amount of the diverted funds regardless of the lack of earnings and profits of the corporation. In *Leaf* we based our holding on section 22(a) of the Internal Revenue Code of 1939, the predecessor of section 61(a), which defines gross income as "all income from whatever source derived," and on the following language in *Rutkin v. United States*, 343 U.S. 130, 137 (1952):

An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he

---

[4]We note that the record contains no evidence pertaining to petitioner's basis in the stock of the corporations in question and that respondent does not make the alternative argument that any part of the distributions to petitioner are taxable as capital gain income.

derives readily realizable economic value from it. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it.

Such gains are taxable in the yearly period during which they are realized.

*Leaf* and *Rutkin* are distinguishable from the instant case. *Leaf* and *Rutkin* both involved an unlawful receipt of funds by the taxpayer. The taxpayer in *Rutkin* had extorted funds from another individual, and the issue was whether extorted money was taxable to the extortionist despite the holding in *Commissioner v. Wilcox*, 327 U.S. 404 (1946), in which the Supreme Court had decided that embezzled funds did not constitute taxable income.[5]

In *Leaf*, corporate funds that should have been available to creditors were fraudulently transferred to the taxpayer in contemplation of bankruptcy. We need not and do not express an opinion on the need to apply a constructive dividend analysis in a situation where the shareholder utilized the corporation to steal from, embezzle from, or otherwise defraud other stockholders or third parties dealing with the corporation or shareholder. The taxpayer in *Leaf* had argued that the diverted funds were loans and therefore not taxable as income to him. We refused to adopt the taxpayer's characterization in the absence of any evidence of an intention to make repayment at the time of the taking.

The issue in *Leaf* was whether the taxpayer's obligation to repay the diverted funds and his actual restitution of some of those funds in a later year precluded his liability for tax on their receipt. We held that the taxpayer had such control over the funds that they represented taxable income to him for the year in which they were taken. Although the taxpayer in *Leaf* was the sole shareholder of the corporation, he did not argue that the diverted funds constituted constructive dividends, and, therefore, this issue was not before the Court.

Respondent's reliance on *American Insulation Corp. v. Commissioner*, T.C. Memo. 1985-436, *Rosenbaum v. Com-*

---

[5]*Commissioner v. Wilcox*, 327 U.S. 404 (1946), was later overruled by the Supreme Court in *James v. United States*, 366 U.S. 213 (1961).

*missioner,* T.C. Memo. 1983-113, n. 10, and *Halpern v. Commissioner,* T.C. Memo. 1982-31, n. 9, is also misplaced. In each of those cases our statement indicating that it may be unnecessary to classify a sole shareholder's diversions of corporate income as constructive dividends was not a predicate to the holding in the case and therefore constituted dicta.

In this case, petitioner's diversions of income from Asphalt Patch and Jim T. Enterprises were not per se unlawful. The diverted funds were not, at least on their face, stolen, embezzled, or diverted in fraud of creditors. There has been no suggestion that the diversions were improper as a matter of corporate law. They are most appropriately described as distributions made by the corporations to their sole shareholder. *DiZenzo v. Commissioner,* 348 F.2d 122 (2d Cir. 1965), revg. T.C. Memo. 1964-121; *Simon v. Commissioner,* 248 F.2d 869 (8th Cir. 1957), revg. a Memorandum Opinion of this Court. See also Gardner, "The Tax Consequences of Shareholder Diversions in Close Corporations," 21 Tax L. Rev. 223, 226-242 (1966).

Respondent also relies on *Davis v. United States,* 226 F.2d 331 (6th Cir. 1955), and *Weir v. Commissioner,* 283 F.2d 675, 684 (6th Cir. 1960), revg. a Memorandum Opinion of this Court, in which the Sixth Circuit held that it is not necessary to classify a sole shareholder's diversions of corporate income as constructive dividends. The Sixth Circuit reasoned in both cases that the taxpayer's dominion and control over the diverted funds warranted taxation of the diverted funds as ordinary income.

We respectfully disagree with the analysis of the Sixth Circuit. As a general proposition, where a taxpayer has dominion and control over diverted funds, they are includable in his gross income under section 61(a) (*Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431 (1955)), unless some other modifying Code section applies. The latter is the situation here, since Congress has provided that funds (or other property) distributed by a corporation to its shareholders over which the shareholders have dominion and control are to be taxed under the provisions of section 301(c).

We believe that the Eighth Circuit more aptly described the manner in which such diversions should be treated for tax purposes:

The corporate distribution here was made with the knowledge of the stockholders and was acquiesced in by them. The corporation is liable for a substantial tax upon the diverted income it failed to report. Further tax will be collected from taxpayers under the constructive dividend theory. Fraudulent tax dealings should not be encouraged. Criminal penalties are provided for tax evasion, and fraud and delinquency penalties are assessed upon taxes due when the circumstances warrant. The Government should be allowed to collect all tax and penalties authorized by law, but it is not our function to expand tax liability to fields not covered by statute. We find nothing in the Tax Court's opinion to indicate that the diverted sums represented salary or any other recognized ordinary income. We believe that the only way that the diverted income already taxed to the corporation can be taxed to the individual taxpayers is by the treatment of such diversions as dividends and corporate distributions. * * * [*Simon v. Commissioner*, 248 F.2d 869, 876-877 (8th Cir. 1957).]

In *Benes v. Commissioner*, 42 T.C. 358 (1964), affd. 355 F.2d 929 (6th Cir. 1966), cert. denied 384 U.S. 961 (1966), we rejected a constructive dividend theory and held that a sole shareholder was taxable to the full extent of the economic benefit conferred upon him when his corporation built a residence for him, regardless of the amount of earnings and profits of the corporation. *Benes,* however, was appealable to the Sixth Circuit, and we gave substantial deference to the holding in *Davis v. United States, supra.* In *Benes v. Commissioner*, 42 T.C. at 378, we followed the Sixth Circuit's holding on consideration of Benes' appeal from his conviction in the related criminal case that "The rationale of *Davis v. United States, supra,* is controlling here." *Benes v. United States,* 276 F.2d 99, 105 (6th Cir. 1960).

The instant case is appealable to the Ninth Circuit, and therefore we are not bound by the holding in *Davis v. United States. Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Our research has revealed no civil tax case in which the Ninth Circuit has ruled on this issue, nor have the parties drawn our attention to any.

Respondent relies on *United States v. Miller*, 545 F.2d 1204 (9th Cir. 1976), in which the Ninth Circuit refused, in a criminal proceeding, to apply the constructive distribution rules automatically to shareholder diversions of corporate funds. As the *Miller* court explained:

> This court must decide whether the rules of constructive distribution are to be automatically applied in the present situation, a review of a *criminal* tax proceeding. In civil tax cases the purpose is tax collection and the key issue is the establishment of the amount of tax owed by the taxpayer. In a criminal tax proceeding the concern is not over the type or specific amount of the tax which the defendant has evaded, but whether he has willfully attempted to evade the payment or assessment of a tax.
>
> The difficulty in *automatically* applying the constructive dividend rules to this case is that it completely ignores one essential element of the crime charged: the willful intent to evade taxes, and concentrates solely on the issue of the nature of the funds diverted. The latter aspect is not the important element. Where the taxpayer has sought to conceal income by filing a false return, he has violated the tax evasion statutes. It does not matter that that amount could have somehow been made non-taxable if the taxpayer had proceeded on a different course. To apply the constructive distribution rules to this situation would nullify all of the taxpayer's prior unlawful acts.
>
> [545 F.2d at 1214. Emphasis in original; citations and fn. ref. omitted.]

The Ninth Circuit ultimately agreed with the trial court's holding that the diversions in question constituted salary to the defendant. Respondent does not claim nor has he introduced evidence that the diversions were in the nature of salary to the petitioner.

In concluding our discussion of the constructive dividend issue, we would emphasize that in a case such as this, diverted amounts taxed to a shareholder as constructive dividends also remain fully taxable to the corporation to which attributable. The record indicates that the corporations in question did not report the diverted funds. But respondent's agents became well aware of the existence of Asphalt Patch and Jim T. Enterprises, and the fact that taxable income had been diverted from them, during the examination of petitioner's tax affairs. We know of nothing which would have prevented a parallel examination of the corporate tax affairs and a determination of the correct taxable income reportable by the corporations.

For the foregoing reasons, we hold that the amounts diverted by petitioner from his corporations constitute

constructive dividends and are taxable to him under the provisions of section 301(c). To the extent that this Court's decision in *Benes v. Commissioner, supra,* reaches a contrary result, it will no longer be followed.

## Fraud

Respondent takes the position that underpayments of petitioner's income tax for the years in issue are due to fraud and that a 50-percent addition to tax should be imposed against petitioner, but not Linda, for each of those years. Section 6653(b)[6] provides that a taxpayer must pay an addition to tax if any part of an underpayment of tax required to be shown on a return is due to fraud. Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment for each year in issue was due to fraud. Sec. 7454(a); Rule 142(b). Respondent must establish (1) that petitioner has underpaid his taxes for each year and (2) that some part of the underpayment is due to fraud. *Hebrank v. Commissioner,* 81 T.C. 640, 642 (1983). Respondent has established that petitioner has underpaid his taxes for each of the years in issue. Respondent's burden of proving fraud is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. *Stoltzfus v. United States,* 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); *Rowlee v. Commissioner,* 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved from the entire record. *Gajewski v. Commissioner,* 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be presumed. *Drieborg v. Commissioner,* 225 F.2d 216, 218 (6th Cir. 1955); *Beaver v. Commissioner,* 55 T.C. 85, 92 (1970). Because fraud can rarely be established by direct proof of the taxpayer's intention, fraud may be proved by circumstantial evidence. *Rowlee v. Commissioner, supra* at

---

[6]Sec. 6653(b) as in effect during the years in issue provided as follows:

SEC. 6653(b). FRAUD. If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.

1123. The taxpayer's entire course of conduct can be indicative of fraud. *Stonee v. Commissioner,* 56 T.C. 213, 224 (1971). Upon consideration of the entire record, we conclude that respondent has sustained his burden of proving fraud by clear and convincing evidence for each of the years in issue.

Although mere understatement of income alone is not sufficient to prove fraud, the consistent and substantial understatement of income is, by itself, strong evidence of fraud. *Marcus v. Commissioner,* 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Petitioner diverted to his own use $22,231.86, $46,083.48, and $44,234.71 of income earned by his solely owned corporations during the years 1977, 1978, and 1979, respectively, and failed to report any of this income either on the corporations' income tax returns or on his own individual returns for those years.

A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See *Holland v. United States,* 348 U.S. 121, 137 (1954); *Otsuki v. Commissioner,* 53 T.C. 96 (1969); *Probber v. Commissioner,* T.C. Memo. 1985-193, affd. without published opinion 788 F.2d 3 (2d Cir. 1986). In this case, petitioner failed to keep records of income from trucking work and paving jobs that he diverted to his own use. None of the bookkeepers he employed knew that this income existed. Petitioner destroyed invoices for paving jobs and paperwork relating to trucking work.[7] Rather than deposit checks made payable to the corporations in payment for work done by the corporations into the corporations' accounts, petitioner either cashed them or deposited them into his own

[7]Peterson testified that petitioner threw invoices for paving jobs and paperwork relating to trucking work into the wastebasket. Petitioner attacks Peterson's credibility, contending that Peterson was a "disgruntled ex-employee * * * out to get petitioner."

We had an opportunity to observe Peterson's demeanor on the witness stand, and we find his testimony credible. Moreover, other evidence corroborates Peterson's testimony. Petitioner has conceded that he did not report as income, either on his individual or joint income tax returns or on his corporations' corporate income tax returns, the amounts of $22,231.86, $46,083.48, and $45,659.71 for the respective taxable years 1977, 1978, and 1979, that were earned by his corporations. These amounts were also omitted from the corporate records. Although Special Agent Hovey served summonses on petitioner requesting records that might document the receipt of this income, petitioner failed to produce any. Accordingly, we conclude that Peterson told the truth when he testified that petitioner destroyed the records.

account. We find that the diversions of corporate funds to petitioner's personal use were carried out in this manner with the purpose and design of concealing their existence and avoiding income tax on these amounts.

Petitioner's conduct throughout the investigation of his returns further evidences his fraudulent intent. When Special Agent Hovey first met with petitioner on June 23, 1980, petitioner told Hovey that his corporation had stopped doing paving work in 1978. However, the evidence shows that in 1979 Jim T. Enterprises had been paid by Forest City Dillon-Tecon Pacific for paving work. When Hovey asked petitioner whether his corporation had done work for Forest City Dillon-Tecon Pacific, petitioner replied that the firm was next door. A check issued to Jim T. Enterprises from Forest City Dillon-Tecon Pacific was included on an amended corporate return filed 1 month after the meeting. Petitioner's false and misleading statements to respondent's agent are indicia of fraud. *Grosshandler v. Commissioner*, 75 T.C. 1 (1980). Petitioner's filing of an amended return in no way mitigates the fraud perpetrated in the filing of the original return. *Naples v. Commissioner*, 32 T.C. 1090, 1097 (1959).

Hovey served summonses on several banks requesting records of checking and savings accounts maintained by petitioner personally and by the corporations. Petitioner wrote to the banks asking them not to comply with the summonses. Hovey was forced to obtain a court order to enforce the summonses and receive the bank records. Petitioner's interference with respondent's investigation is also indicative of his intent to conceal the diverted income and evade tax.[8]

---

[8] Our findings of fact regarding petitioner's conduct during the investigation of his returns is based on the unrefuted testimony of Special Agent Hovey. Petitioner argues on brief:

"The Government wants to make a large issue of the fact that Mr. Hovey, Special Agent, had a difficult time in his investigation. It is quite obvious that Mr. Hovey and Mr. Truesdell, petitioner, did not get along. It is suggested that the only reason the fraud penalty has been asserted in this case is out of a personal vendetta initiated by Special Agent Hovey and directed to petitioner in retaliation for petitioner's refusal to wholeheartedly give up his constitutional rights to his privacy and freedom of unreasonable searches and seizures."

Nothing in the record supports petitioner's allegations, and we find his arguments on this issue frivolous.

To reflect the foregoing,

> *An appropriate order will be issued and decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, CHABOT, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WILLIAMS, WELLS, RUWE, and WHALEN, *JJ.*, agree with this opinion.