[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action is an appeal by the plaintiff, Stewart J. Leonard, Sr., d/b/a Stew Leonard's Dairy, from the decision of the Commissioner of Revenue Services (Commissioner) imposing upon the plaintiff an assessment of sales and use tax plus interest and a 25% fraud penalty for the period of July, 1983 through March, 1992. Stew Leonard's Dairy is a Connecticut partnership engaged in the retail dairy and grocery sales business with a principal place of business in Norwalk, Connecticut. The plaintiff appeals pursuant to General Statutes § 12-422, claiming that the Commissioner's assessment is invalid because it is based upon assumptions of fact that are erroneous. A threshold issue in this case is whether the three year statute of limitations in General Statutes § 12-415(7) bars the deficiency assessment for the CT Page 4290 period prior to February, 1989. The Commissioner claims that the three year limit does not apply because of the plaintiffs fraud. The parties have submitted a stipulation of facts accompanied by twenty-eight stipulated exhibits. (See Court's Exhibit 1.) The parties have agreed, with this court's consent, to bifurcate this trial so that the only issue currently before the court is whether the deficiency assessment for the period prior to February 1989 is barred by the limitation period in General Statutes § 12-415(7).
The Commissioner's assessment arises out of a plea agreement entered into between the plaintiff and the Internal Revenue Service (IRS). This plea agreement was entered into on July 22, 1993 by four members of Stew-Leonard's Dairy (Dairy) management, including Stewart J. Leonard, Sr., who pled guilty to the charge of conspiracy to defraud the United States government. The IRS and Leonard agreed that Leonard would pay to the IRS $15,000,000 in tax, penalties, and interest for the years 1981 through 1991 in settlement of all federal tax liabilities for the years 1980 through 1991. The $15,000,000 was arrived at by the U.S. Attorney's office, the IRS and Leonard's attorney. One of the factors in arriving at the settlement was the consideration of the sentencing guidelines. The IRS used a computer program to input various factors to arrive at a final number. The factors were not based upon any records of the Dairy. The $15,000,000 amount was basically an arbitrary figure. For the sake of numbers, the IRS used $1,250,000 as an allocation of additional individual yearly income to Leonard. This amount was not based upon the actual receipt of excess money by Dairy for the years in issue, but was an agreed-upon figure for settlement purposes.
The conspiracy charge resulted from the following facts. In 1991, the IRS began an investigation of Stewart J. Leonard, Sr.'s personal tax returns. The investigation discovered that certain members of the Dairy management had been diverting currency receipts for their personal benefit. A computer software program was developed by the Dairy's computer systems manager to create and implement a program called the "Equity Program." The Equity Program was funded when the daily receipts of sales were brought CT Page 4291 to the bank for deposit. Before the funds were deposited in the bank, the money vault manager removed a certain amount of currency from the bank deposits and diverted these deposits to the Equity Program. The money vault manager altered Dairy's bank deposit records and altered the data on the handwritten daily store report to conform to the reduced deposit. The total store sales and the bank deposits were the only documents altered. The object of the Equity Program was to reduce the amount of sales reported by Dairy to the IRS. The Equity Program scanned all sales to determine if the sales had met their daily criteria. As an example, the program was designed to say that today's criteria for the sale of cucumbers would be 50 units. If more than 50 units of cucumbers were sold, the excess was diverted into the Equity Program. The Equity Program scanner went through every single item that was sold that day. The amount diverted was spread over a wide spectrum of products. Some calculations amounted to pennies per item. The Equity Program actually overwrote the information forwarded to it. The actual data in the financial records, including sales takes collected, bottle deposits, bottle refunds, and vendor coupons, was never altered by the Equity Program. The Equity Program did not change the books and records of the business. It only altered the data of the bank deposits. This made it untraceable.
Sales made at the Dairy were recorded by approximately 25 automatic scanning cash registers. The products sold were coded with Universal Price Code (UIPC) bar codes and read into the scanners at the time of sale. All of the data was collected on the downstairs computer system and transferred to the upstairs financial computer system. When the data went upstairs, it was divided into two primary data files. The two files were the UPC file and the financial file. The UPC file was the record which contained the number and type of items sold, the margin and the profit which the Equity Program altered after scanning the spectrum of products sold. There was no sales tax data involved in the UPC file. The financial file was sent to the accounting department which would prepare the tax returns. The IRS special agent who discovered the Equity Program ran it to develop a feel for how the program operated. When asked if she would have notice CT Page 4292 if the sales taxes had been altered by the program, Special Agent Doreen Schulze testified at the trial in this case: "Yes, . . . I would have noticed it, documented it, and reported it to the agent." (Transcript, July 21, 1999, morning session, p. 49; see also p. 52.) Special Agent Lawrence Marini also testified that to his understanding, the Equity Program did not affect the sales tax records. (Transcript, July 21, 1999, morning session, p. 34.)
After the IRS started its investigation of the plaintiff in 1991, a revenue examiner for the Connecticut Department of Revenue Services (DRS) commenced an audit of the sales and use tax returns of the Dairy in February, 1992. During the audit, the Dairy executed consents to extend the limitations period for assessment of additional sales and use taxes under General Statutes § 12-415(8). The several extensions executed by the Dairy resulted in an extension until April 30, 1996 for the mailing of a notice of deficiency for the periods ending February, 1989 through February, 1993. In 1994 and 1995, the Dairy made payments of $91,233 and $81,751 for additional sales and use tax based on agreed-upon adjustments for the period of February, 1989 through March, 1992. The revenue examiner rendered a final sales and use tax report on February 27, 1996 proposing the assessment of sales and use tax liabilities against the Dairy in the amount of $511,821.15 for the periods ending July, 1983 through March, 1992. In March 1996, the Commissioner issued a notice of assessment of sale and use tax showing a total assessment of $1,402,514.42, composed of $511,821.15 tax, plus a penalty of $148,414.99, and interest of $742,278.10, computed through March 31, 1996. The Dairy protested the Commissioner's assessment of additional sales and use tax and imposition of the fraud penalty based upon the revenue examiner s adoption of the settlement figures arrived at by the IRS and Leonard as part of the plea agreement with the federal government. The protest was denied by the Commissioner.
The revenue examiner used the IRS figure of $1,250,000 of additional yearly income multiplied by ten years, or $12,500,000 as the additional amount of gross receipts received by the Dairy, and based the sales tax deficiency and penalty on this amount. CT Page 4293 The revenue examiner used the settlement figures of the IRS because the IRS had possession of all of the records of the Dairy that would be needed to conduct an actual audit, such as sales journals, daily reports, and cash receipt tapes. The IRS would not release these records to the DRS.
The preparation of the Dairy's Connecticut sale and use tax returns were made by the Dairy's controller. The controller was not a participant in the Equity Program and was not aware of its existence. The computerized scanning cash registers, at the point of sale, scanned each sale for taxable items and the collection of the sales tax. The scanners picked up five primary areas of sales information collected from each bar code: units sold, retail dollars sold, cost dollars sold, retail discount dollars sold, and retail discount units sold. This information, along with the sales tax collected, was automatically transmitted from the computerized cash registers into the point of sales system's computer data base. For each of the monthly sales tax periods at issue in this action, Dairy filed with DRS a sales and use tax return, and paid the tax shown to be due on the return. The sales tax figures were taken from these unaltered records located in the financial file.
The basic difference in concepts used by the Commissioner and the Dairy is that the Commissioner computed the Dairy's sales and use tax obligation by taking the IRS settlement figure, less deductions, and multiplying that by the sales tax percentage to arrive at the amount of tax due. The Dairy, on the other hand, collected the sales tax at the point of sale and based its computation of its sales and use tax reports to DRS on the total amount of sales taxes collected. The Equity Program only changed the total sales for the day and the total bank deposits for the day. The Equity Program did not alter the amount of sales tax collected each day and turned over to the state. As an example, the gross store sales for a particular day may have been 510,000 after adjustment by the Equity Program, but the day's collection of $519.37 in sales taxes would not have been affected. The total sales tax collected represented the total sales tax collected from every single transaction during the day. CT Page 4294
The controller, who was not aware of the Equity Program, determined the amount of use taxes due by maintaining a Connecticut Use Tax Accrued Report. This report was based on the controller's review of all the invoices that came into accounts payable. The invoices were for service rendered and for rentals. All invoices that did not show the collection of a sales tax would be picked up on the use tax form. The controller reviewed all sales and use tax returns filed by the Dairy with DRS from 1983 to 1992.
There are two issues before this court. The first issue is whether the contested assessment of sales and use tax for the period from July 1983 until February, 1989 is barred by the three year limitation period in General Statutes § 12-415(7). The second issue is whether the sales and use tax assessment was correctly determined under the circumstances of this case. As stated above, resolution of the second issue is deferred to a future date.
General Statutes § 12-415(7) recites in pertinent part:
 Except in the case of fraud, intent to evade this chapter or authorized regulations, failure to make a return, or claim for additional amount pursuant to subsection (3) of section 12-418, every notice of a deficiency assessment shall be mailed within three years after the last day of the month following the period for which the amount is proposed to be assessed or within three years after the return is filed, whichever period expires later.
As stated above, the plaintiff consented to the extension of the limitation period for the mailing of a notice of deficiency assessment for the periods ending February, 1989 through February, 1993. There is no evidence that the plaintiff consented to extensions for the period commencing in July 1983 through January 1989. The Commissioner takes the position that the three year limitation set forth in § 12-415(7) is not a bar to the assessment related to the earlier period because of the Dairy's CT Page 4295 alleged commission of fraud with respect to the sales and use tax returns filed by the Dairy during the contested period. The Commissioner also claims that the admission of the perpetration of fraud committed upon the IRS provides a basis for the finding of fraud, and that the fraud need not be directed against the DRS in order to avoid the three year limitation period based upon the fraud exception. The Commissioner argues that there is a close interdependence between federal income tax returns and state sales and use tax returns; and that the fraud by Leonard affected the ability of DRS to audit the sales and use taxes of the Dairy. This argument is based on the fact that DRS could not audit the Dairy's records because the IRS kept all of the Dairy's records and refused to release these records to DRS.
The Commissioner concedes that there is no statutory definition of fraud in the sales and use tax chapter of the General Statutes to provide guidance on the question of whether a taxpayer has committed fraud so as to avoid the three year limitation period for deficiency assessments. Since there is no statutory guidance in defining fraud, the Commissioner relies upon the common law definition of fraud in civil actions, citing Miller v. Appleby,183 Conn. 51, 55, 438 A.2d 811 (1981). The elements of common law fraud are recited in Kilduff v. Adams. Inc, 219 Conn. 314, 329,593 A.2d 478 (1991), as follows:
1. A false representation was made as a statement of fact;
 2. It was untrue and known to be untrue by the party making it;
3. It was made to induce the other party to act on it; and
4. The latter did so act on it to his injury.
The Dairy contends that on the issue of fraud, the burden is on the Commissioner to prove fraud, and to do so by clear and convincing evidence. We have never required a party accused of committing fraud to prove his or her innocence. It has always been the burden of the party asserting the fraud to prove the CT Page 4296 common law elements of fraud by clear and satisfactory or unequivocal evidence. Kilduff v. Adams Inc., supra,219 Conn. 327-329.
Under federal tax principles, it is the commissioner, not the taxpayer, who has the burden of proof whenever taxpayer fraud is claimed. See IRC section 7454(a), 26 U.S.C. § 7454(a); United States Tax Court Rule 142(b). In federal tax cases, it is also clear that the requisite standard of proof is by "clear and convincing evidence." Kings Court Mobile Home Park, Inc. v.Commissioner, 98 T.C. 511, 515 (1992). As the plaintiff points out, in the context of federal tax laws, fraud means "wilful wrongdoing with the specific intent to cheat the government of taxes known by the taxpayer to be owed, coupled to a tax deficiency caused by the malfeasance. See DiLeo v. Commissioner,96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). The existence of fraud is a factual question to be determined from all the facts and circumstances in evidence. Id. The taxing authority meets its burden of proof by showing the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Id. Fraud may never be presumed. Truesdell v.Commissioner, 89 T.C. 1280, 1301 (1987).
The reason that we look to federal tax principles in interpreting state tax statutes is that our state courts have repeatedly recognized that our tax laws incorporate federal tax principles. Skaarup Shipping Corporation v. Commissioner,199 Conn. 346, 351, 507 A.2d 988 (1986). See also Levy v. Miller,44 Conn. Sup. 126, 129, 669 A.2d 1260 (1995). Incorporating Federal tax concepts in this case, the Commissioner has the burden of proof to show by clear and convincing evidence that the plaintiff taxpayer committed fraud against the Commissioner by wilful wrongdoing with the specific intent to deprive the state of taxes known by the plaintiff to be owed.
Based upon the facts previously found, the source data used by the Dairy's controller to report the Dairy's Connecticut sales tax liabilities was the actual, unaltered data in the Dairy's CT Page 4297 financial records of the sales taxes collected. The sales taxes were collected at the point of sale and remitted to the state by the controller on a regular basis. The Commissioner did not have the Dairy's records to do a proper audit of the sales tax liability of the plaintiff, and the IRS did not conduct an audit of the Dairy that showed any alteration of sales tax figures that would result in an under reporting of sales tax to DRS. However, even though the Commissioner's audit was certainly hampered by the unavailability of the records, the evidence submitted to the court shows no indication of an intent to defraud the state by under reporting sales tax. The evidence shows that the Equity Program was designed to alter and divert the gross receipts, resulting in the substantial understatement of the gross receipts on the Dairy's federal partnership returns and under reporting of Leonard's federal income and tax liabilities on his personal federal income tax returns.
We find, based upon the stipulated facts, exhibits, and testimony at trial, that the Commissioner has not met the burden of proving the fraud of the plaintiff by clear and convincing evidence. We therefore find that without the establishment of fraud on the part of the plaintiff, the Commissioner may not collect the amount of tax, interest and penalty contained in the notice of deficiency assessment for the period prior to February, 1989. The Commissioner cannot use the fraud perpetrated upon the IRS to provide the basis for a claim of fraud against the state to avoid the three year limitation in § 12-415(7). Although the Commissioner was understandably suspicious that fraud was committed against the state because of the fraud committed against the IRS, we find that the suspicion of fraud is not enough. See Truesdell v. Commissioner, supra, 89 T.C. 1301. The Commissioner has not presented any concrete evidence substantiating the claim of fraud committed by the plaintiff with respect to the sales and use tax figures reported in the Dairy's state sales and use tax returns.
The court will schedule a further hearing for the resolution of the plaintiffs claims regarding the propriety of the sales and use tax deficiency assessment for the period ending February 28, 1989 through February 28, 1993. CT Page 4298
Arnold W. Aronson, Judge Trial Referee