FRANKLIN D.R. CORCORAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Corcoran v. Commissioner
Docket No. 24118-88
United States Tax Court
T.C. Memo 1991-367; 1991 Tax Ct. Memo LEXIS 416; 62 T.C.M. (CCH) 370; T.C.M. (RIA) 91367; August 6, 1991, Filed *416 Decision will be entered under Rule 155. Dennis N. Brager and Rufus V. Rhoades, for the petitioner. Steven A. Wilson, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACTS AND OPINION Respondent determined a deficiency in and additions to petitioner's 1986 Federal income tax as follows: Additions to tax under section
Deficiency
6653(b)(1)(A)
6653(b)(1)(B)
6661
$ 2,568,768
$ 1,926,576
*
$ 642,192
After concessions by both parties, the issues are (1) whether $ 1,494,947 petitioner withdrew from the Quicksilver account is taxable; (2) whether $ 532,463 of the $ 1,449,921 deposited in the Interdelta account is taxable; (3) whether $ 100,000 purportedly deposited in one of petitioner's bank accounts is taxable; (4) whether petitioner is liable for additions to tax for fraud under section 6653(b)(1)(A) and (B), or in the alternative, for additions to tax for negligence under section 6653(a)(1)(A) *417 and (B); and (5) whether petitioner is liable for an addition to tax under section 6661 for a substantial understatement of income tax. Petitioner has conceded that he cannot substantiate and was not entitled to deduct $ 50,000 he claimed as Interdelta corporate business expenses. Respondent has conceded his determination of $ 2,860,126 in income as a duplication of other income items due to transfers among bank accounts. Both parties made hearsay objections to various testimony at trial. As neither party has addressed any hearsay issues on brief, we assume that they have conceded their objections. All section references are to the Internal Revenue Code as amended and in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts are stipulated and are so found. Franklin D. R. Corcoran (petitioner) resided in Santa Barbara, California, at the time he filed his petition. The highest grade petitioner completed in school was the eleventh grade. Petitioner has never taken any courses in accounting, bookkeeping, or finance. Petitioner worked in Libya from 1969 until 1982 as the maintenance manager *418 of the oil fields and terminal for the Occidental Petroleum Corporation (Occidental). Petitioner had approximately 1,700 persons working for him, most of whom were Libyan. Petitioner worked for the National Oil Company of Libya from 1982 until 1985 in the same capacity as he had been employed by Occidental. Petitioner became acquainted with Abdulraheem Bader (Bader), a Libyan, in 1972. Bader was the employee relations representative for Occidental. Petitioner and Bader socialized together often. Petitioner visited Bader's home, met his family, and considered Bader a close friend. Bader and petitioner also considered undertaking various business ventures together. Among the proposals considered were exporting classic cars from Europe to the United States for resale and the purchase of condominiums in London. Bader was very wealthy, and petitioner controlled bank accounts with Bader's funds in them. Petitioner often vacationed in London. He opened a bank account at Midland Bank in London in order to have funds available there. The funds deposited in the Midland account were either from petitioner's salary or another account called the Interdelta account. Petitioner had *419 business contacts with American airplane manufacturers. Bader asked petitioner to help him broker the sale of two airplanes, for which they would receive commissions. Bader told petitioner that the purchasers of the airplanes would base the planes in Benin, Africa, and that the planes were to be used to haul equipment for a construction project in Libya. Petitioner helped arrange the sale of two Lockheed L-100 airplanes. Bader insisted that his name not be listed by petitioner in any documentation of the aircraft sale. Bader told petitioner, and petitioner believed, that if the Libyan government found out that Bader had profited on the sale, the government might harm Bader or his family or both. Bader asked petitioner to arrange that their commissions be disbursed to them in a manner that would allow Bader to remain anonymous. In April or May 1985, petitioner purchased a shell Panamanian corporation, Interdelta S.A. (Interdelta), for the purpose of opening bank accounts in which the commissions could be deposited. Petitioner was the sole shareholder of Interdelta during 1985 and 1986. Petitioner used Interdelta to open five bank accounts in its name at the London branch of *420 Handelsbank, a Swiss bank. The airplanes were sold, and on May 28, 1985, $ 1,449,921 was deposited in Interdelta account number 509009.00-01 (the Interdelta account). Petitioner was the only signatory on the Interdelta account. An additional $ 1,499,965 from the aircraft sale was deposited in account number 659340.00-01 at Handelsbank. This account was known as the Quicksilver account. Petitioner did not keep any records of these transactions. Petitioner moved from Libya to California in June 1985. In July 1985, U.S. Customs Service agents questioned petitioner about the airplane sale and the possible illegal diversion of the aircraft from Benin to Libya. Petitioner told the agents that his commission on the sale was $ 1,400,000. Petitioner was requested to testify at a grand jury investigation regarding whether the sale violated export laws. Petitioner consulted a lawyer who advised him against testifying unless prosecutors granted petitioner immunity. Despite this advice, petitioner testified without a grant of immunity because he believed the airplane sale to be a legal transaction. In March or April 1986, petitioner visited London and transferred approximately $ 370,000 *421 out of the Interdelta account to a business associate to purchase condominiums in London for Bader. Petitioner also withdrew at least $ 162,463 from the Interdelta account and gave the money to Bader in cash. Petitioner did not document any of these transactions because Bader objected to such records. Petitioner trusted Bader, and the two did business on a handshake. On July 22, 1986, petitioner and Bader, among others, were indicted for violating the Arms Export Control Act, 22 U.S.C. section 2778, and other laws. Petitioner was arrested, incarcerated, and his bail set at $ 1,000,000. Petitioner did not have sufficient assets to meet this bail. Petitioner's wife telephoned Bader, explained the situation, and asked Bader for $ 1,000,000 for bail and additional funds for an attorney. Petitioner's wife received permission from Bader for petitioner to use the funds in the Quicksilver account. Petitioner had $ 1,494,947 transferred from that account to a California bank. From these funds, petitioner paid $ 1,000,000 for bail, $ 200,000 to a criminal defense lawyer, $ 100,000 to the Internal Revenue Service for a previous tax liability, and kept the remainder for personal expenses. *422 Petitioner was tried and acquitted of all criminal charges, although Edward J. Elkins, a participant in the aircraft sale, was found guilty of violating the Arms Export Control Act and the Export Administration Act. Alan Rosen (Rosen), an accountant, prepared petitioner's 1986 tax return. Rosen prepared a Schedule B, on which petitioner reported a $ 908,739 dividend from Interdelta which represented petitioner's commission on the airplane sale of $ 917,458 less expenses. Rosen checked the box on the Schedule B indicating that petitioner had an interest in a foreign bank account. Rosen then prepared a Form TD F 90-22.1, "Report of Foreign Bank and Financial Accounts." On this form, Rosen listed six foreign bank accounts numbers: Five of the accounts were held in the name of "Inter Delta S.A." at Handelsbank, and one of the accounts was held in petitioner's name at Midland Bank in London. On the part of the form that requested "Maximum value of account," Rosen checked the box "over $ 100,000." Petitioner filed his individual Federal income tax returns for 1981, 1982, 1983, and 1984 on December 16, 1986, and for 1985 on July 24, 1986. His 1986 individual Federal income tax return *423 was timely filed. For the years 1983, 1984, and 1985, petitioner did not report a tax liability. Respondent examined petitioner's 1985 taxable year. The parties entered into a closing agreement in which they agreed that the tax consequences, if any, of the May 1985 deposit of $ 1,449,921 was attributable to the taxable year 1986. OPINION 1. Petitioner's withdrawal of $ 1,494,947 from the Quicksilver account
The parties agree that petitioner withdrew $ 1,494,947 from the Quicksilver account and then disbursed the money as described above. Petitioner contends that the funds withdrawn were a loan or advance from Bader and thus are nontaxable. Whether a bona fide debtor-creditor relationship exists is a question of fact, and essential elements are the intent of the recipient of the funds to make monetary repayment and the intent of the person advancing the funds to enforce repayment. Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970). Whether the recipient had an intent to repay and the lender an intent to enforce repayment is determined at the time of receipt of the funds. Frierdich v. Commissioner, 925 F.2d 180, 184 (7th Cir. 1991), *424 affg. a Memorandum Opinion of this Court; Estate of Chism v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Indicative of an intent to repay are whether a note evidencing the indebtedness was executed, whether the parties agreed on the rate of interest, whether there was a fixed maturity date, whether a security interest was given the creditor, and whether the debtor had the ability to make repayment. Frierdich v. Commissioner, supra at 182; Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), affg. a Memorandum Opinion of this Court. The Court is faced with a difficult problem in attempting to find the facts in this case. The background and surrounding circumstances are quite unusual. Petitioner lived and worked in Libya, a nondemocratic country with an anti-American government. Through their mutual employment by Occidental, petitioner and Bader became good friends and also business partners in transactions outside their work for Occidental. There was testimony to the effect that Bader was an agent for the Libyan government. Whether or not Bader was such an agent, *425 Bader's business activities of necessity were kept secret and without a paper trail if Americans or the United States were involved due to anti-American sentiment in Libya. This secrecy makes it extremely difficult for the Court to determine exactly what happened. However, putting the pieces together as best we can and considering the general background and highly unusual facts of this case, we conclude as follows: After petitioner was indicted and incarcerated, he needed money for bail, attorney's fees, satisfaction of amounts owed to the Internal Revenue Service, and living expenses. Petitioner's wife called Bader, who at that time was still petitioner's good friend and business partner. She asked Bader for help and Bader responded in effect, "use the monies in the Quicksilver account, but don't get me or my name involved in any way." The situation was urgent, and there was no discussion of further details of the transaction. In these circumstances, there was no time to prepare a note establishing an interest rate, maturity date, provide for security, or any of the other normal attributes of a more formal loan transaction. Even if there had been time, Bader would not have *426 entered into any such written transaction for the reasons set forth above. Petitioner's now ex-wife, his daughter, and his lawyer all testified that Bader had told them in various separate telephone conversations that the Quicksilver monies were available to petitioner to help out in any way Bader could. Money in the account belonged to Bader, although he did not have signatory authority. Presumably, this is because he did not want his name to appear in connection with transactions involving Americans. Petitioner had signatory authority. Petitioner testified that at the time he withdrew the money from the Quicksilver account, he intended to repay the funds. We believe his testimony and accept his statement of intentions. In the circumstances, it is understandable that petitioner and Bader were not very specific about when, where, or how repayment would be made. Even in normal circumstances, petitioner and Bader trusted one another in their business dealings and conducted business on a handshake. At trial, there was testimony to the effect that Bader accused petitioner of embezzling the Quicksilver monies. This accusation is consistent with petitioner's account that funds *427 were initially loaned to petitioner, but once Bader himself was indicted and the airplane sale transaction was made public, Bader made the embezzlement accusation to disassociate himself from his involvement with Americans and the sale. However, the accusation helps establish that Bader intended to enforce repayment. We conclude that the monies were made available in 1986 to petitioner by his then good friend Bader on terms that were never defined other than that petitioner intended to make repayment and Bader intended to enforce repayment. Bader had no intent to treat the Quicksilver monies as compensation or a permanent transfer to petitioner. Petitioner had the ability to repay the $ 1,494,947 at the time he withdrew the funds. Petitioner could have used the $ 1,000,000 bail money itself as it was paid in the form of a deposit for his appearance at trial, and thus petitioner could anticipate that this amount would be returned to him. As to the repayment of the additional $ 494,947, petitioner urges us to consider that he could look to future income working in the oil industry, income from the proposed classic car venture, and commissions from future sales of additional aircraft. *428 Respondent, on the other hand, points out that petitioner was unemployed when he was arrested in July 1986 and at the time of trial in March 1990. There also is no evidence that petitioner was employed during the interim. However, persons often borrow money in a transaction that constitutes a bona fide loan and assume that they will use future income to make repayment, even when they are not completely certain of the nature of their future income. We conclude that on the facts and circumstances before us, the availability of the Quicksilver funds did not constitute taxable income to petitioner in 1986. What may have happened in other years is not before us. 2. Whether $ 532,463 of the $ 1,449,921 deposited in the Interdelta account is taxable to petitioner
Petitioner reported $ 908,739 ($ 917,458 less expenses) of the $ 1,449,921 deposited in the Interdelta account as a dividend on his 1986 return. Respondent determined that the remainder of the funds in the Interdelta account, $ 532,463, was taxable to petitioner. Petitioner asserts that this amount was income to Bader, and thus not taxable to him. We agree. Petitioner withdrew approximately $ 370,000 which he disbursed *429 to purchase condominiums for Bader, and at least $ 162,463 which he gave to Bader in cash. Respondent contests this finding, which is based entirely on petitioner's testimony. Respondent asserts that petitioner's testimony is not credible because he did not introduce in evidence any bank records to corroborate the withdrawals, nor did petitioner offer any documentation that the condominiums in London were in fact purchased. However, after having observed petitioner's demeanor at trial, we find him a credible witness. We believe the lack of documentation is due to Bader's desire for anonymity and his insistence that they conduct business in a secretive manner. Respondent contends that the $ 532,463 is taxable to petitioner under the claim of right doctrine as enunciated in North American Oil Consolidated v. Burnet, 286 U.S. 417, 76 L. Ed. 1197, 52 S. Ct. 613 (1932). One of the elements of this doctrine is that a taxpayer must receive earnings. North American Oil Consolidated v. Burnet, supra at 424. To the extent that funds were not withdrawn from the Interdelta account and disbursed to Bader or on his behalf, we agree with respondent. However, petitioner reported *430 all the funds in the account that were not disbursed to Bader. Respondent's next theory is that the $ 532,463 was a constructive dividend to petitioner. Necessary to a finding of a constructive dividend is that the corporation has conferred a benefit on the shareholder in order to distribute available earning and profits without expectation of repayment. Meridian Wood Products Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984); Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977); Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). However, the funds paid to Bader or on his behalf for services Bader performed for Interdelta did not benefit petitioner. Thus, there was no shareholder benefit as required for the finding of a constructive dividend. We hold for petitioner on this point. Respondent's final theory is that the $ 532,463 is subpart F income. The parties have stipulated that petitioner was the sole shareholder of Interdelta, a Panamanian corporation, in 1985 and 1986, and that Interdelta was a controlled foreign corporation (CFC) during 1985 and 1986 as defined *431 by section 957(a). Petitioner asserts that subpart F income is limited to a CFC's current earnings and profits. Sec. 952(c)(1)(A). We agree. The current earnings and profits of CFC's are determined according to rules substantially similar to those applicable to domestic corporations. Sec. 964(a); sec. 1.964-1(a), Income Tax Regs. The only business activity ever conducted by Interdelta was the airplane sale for which it received the $ 1,449,921 commission. Because at least $ 532,463 was disbursed to or on behalf of Bader for services rendered, these payments reduce the corporation's earnings and profits, and therefore such amount could not generate subpart F income. An argument could be made that the payments to Bader were illegal bribes or kickbacks, and, thus, do not reduce earnings and profits. Sec. 964(a); sec. 1.964-1(a), Income Tax Regs. However, the testimony that Bader was an agent of the Libyan government was speculative. There was no evidence that the payments made to Bader were illegal, and neither Bader nor petitioner was convicted of violating export laws. 3. Whether $ 100,000 in the Midland Bank account is taxable
Respondent's revenue agent testified *432 that he determined petitioner had $ 200,000 of income based on the Form TD F 90-22.1, which petitioner filed regarding his 1986 return. The revenue agent reasoned that there were two groups of accounts, Interdelta's and petitioner's, and that each group of accounts had a value of at least $ 100,000 because the box on the Form TD F 90-22.1 had been checked that the "maximum value of account" was "over $ 100,000." Respondent concedes that the $ 100,000 attributable to the Interdelta accounts was a duplication of other income items. Respondent still maintains, however, that the determination of the remaining $ 100,000 of income attributable to the Midland Bank account was proper. We disagree. All funds in the Midland Bank account were either from petitioner's wages or from the Interdelta account, which funds were reported by petitioner, and thus respondent's determination was a duplication of other income items. We hold for petitioner on this issue. 4. Additions to tax for fraud or negligence
We next consider whether petitioner is liable for additions to tax for fraud under section 6653(b)(1)(A) and (B), or in the alternative, for negligence under section 6653(a)(1)(A) and *433 (B). Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent raised his alternative argument of petitioner's liability for an addition to tax for negligence for the first time in the Answer. Respondent bears the burden of proof on this issue. Rule 142(a). A section 6653(a) addition to tax for negligence is imposed where any part of an underpayment of income tax is due to negligence or intentional disregard of rules and regulations. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent has not shown that petitioner intended to evade taxes known or believed to be owing by conduct intended to conceal. Respondent argues that petitioner concealed bank accounts and other property. We disagree. All bank accounts were listed on the Form TD F 90-22.1. Respondent asserts that petitioner's transfers *434 of a mobile home which he owned to his parents and an automobile which he owned to his mother-in-law were an attempt to conceal his assets from creditors. However, these transfers alone are minor and do not establish petitioner's intent to evade taxes by clear and convincing evidence. Respondent also contends that petitioner gave implausible or inconsistent explanations of behavior. For example, petitioner gave varying accounts of the commissions on the airplane sale. Petitioner testified at trial that his commission was $ 400,000 and Bader's $ 1,000,000. This testimony conflicts with the commission of approximately $ 1,000,000 ($ 908,739) that petitioner reported on his 1986 return. A third version was petitioner's statement to Customs officials that his commission was $ 1,400,000. However, we accept petitioner's explanation of these contradictory accounts. He told Customs officials that his commission was $ 1,400,000 because he was trying to protect Bader and thus gave a figure that represented both his and Bader's commissions. The conflicting versions regarding whose commission was $ 1,000,000 and whose was $ 400,000 may be due to Bader's insistence that they conduct business *435 in a secretive atmosphere. Perhaps it was unclear to petitioner exactly what amounts were his versus Bader's. While these discrepancies are troublesome, they do not prove an intent to evade taxes. Respondent also asserts that petitioner's failure to file timely returns indicates his fraudulent intent. However, for three of the years in which petitioner failed to file timely returns, he had no tax liability. Given the facts of this case, petitioner's irregular filing habits do not indicate an intent to evade taxes. Respondent has not met his burden of showing that petitioner is liable for the additions to tax for fraud by clear and convincing evidence. We find that a portion of petitioner's underpayment of tax was due to negligence within the meaning of section 6653(a)(1)(A) and (B). Petitioner admitted that he kept few or no records of the transactions at issue. Petitioner cannot shift his responsibility to keep records to others. Respondent has carried his burden of proof on this issue. 5. Addition to tax under section 6661 for substantial understatement
Section 6661(a) imposes an addition to tax if there is a substantial understatement of income tax. Whether petitioner *436 substantially understated his income tax will be determined by the Rule 155 computation. In any event, the only issue respondent has prevailed on to which section 6661 may apply is petitioner's concession that he could not substantiate $ 50,000 of Interdelta corporate business expenses. We assume petitioner considered his potential liability for additions to tax when he conceded this issue, and either was willing also to concede this addition to tax or negotiated with respondent with respect to it. Decision will be entered under Rule 155.
Footnotes
*. 50 percent of the interest due on the deficiency.↩