T.C. Memo. 2019-115

UNITED STATES TAX COURT

BENAVIDES & CO., P.C., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

AL BENAVIDES AND LOUISE A. BENAVIDES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6761-14, 6840-14.                 Filed September 9, 2019.

Al Benavides (an officer), for petitioner Benavides & Co., P.C.

Al Benavides and Louise A. Benavides, pro sese.

<u>David W. Sorensen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In these consolidated cases respondent determined the

following deficiencies and penalties in notices of deficiency issued to Benavides

[*2] & Co., P.C. (BCO), and Mr. and Mrs. Benavides (petitioners) on January 3, 2014:[1]

Docket No. 6761-14

| Year | Deficiency | Penalty sec. 6663(a) |
|------|-----------|----------------------|
| 2003 | $46,725 | $35,044 |
| 2004 | 86,402 | 64,802 |
| 2005 | 92,962 | 69,722 |

Docket No. 6840-14

| Year | Deficiency | Penalty sec. 6663(a) |
|------|-----------|----------------------|
| 2003 | $77,597 | $27,029 |
| 2004 | 81,092 | 19,221 |
| 2005 | 91,173 | 27,170 |

The issues for decision are whether: (1) BCO had unreported income from an accounting and tax preparation business of $195,359, $102,584, and $215,580 for tax years 2003, 2004, and 2005, respectively; (2) BCO is entitled to a net operating loss (NOL) carryforward from 2003; (3) petitioners received

_____

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure, and monetary amounts are rounded to the nearest dollar.

[*3] constructive dividends of $195,359, $132,584,[2] and $215,580 for tax years 2003, 2004, and 2005, respectively, to account for gross receipts that were "diverted" from BCO to other accounts or entities they owned and controlled; (4) petitioners had unreported income from Sunrise, a partnership that they owned, of $123,931, $88,593, and $66,628 for tax years 2003, 2004, and 2005, respectively; (5) Mr. Benavides had self-employment income to reflect his shares of partnership income from Sunrise of $42,219, $110,332, and $82,591 for tax years 2003, 2004, and 2005, respectively; (6) Mrs. Benavides had self-employment income to reflect her shares of partnership income from Sunrise of $40,564, $106,006, and $79,352 for tax years 2003, 2004, and 2005, respectively; (7) BCO is liable for fraud penalties under section 6663(a) of $35,044, $64,802, and $69,722 for tax years 2003, 2004, and 2005, respectively, with respect to its unreported taxable income; (8) petitioners are liable for fraud penalties under section 6663(a) of $27,029, $19,221, and $27,170 for tax years 2003, 2004, and 2005, respectively, with respect to unreported constructive dividends from BCO;

---

[2] The difference between BCO's unreported income and petitioners' constructive dividends determined by respondent for 2004 is attributable to respondent's failure to include in BCO's unreported income a payment of $30,000 from Jeff Sorg that petitioners reported on a different entity's return (Sunrise Management and Development, LLC (Sunrise), discussed below). Respondent determined that this was a payment to BCO but failed to include it in unreported income when calculating BCO's deficiency.

**[*4]** and (9) assessment and collection of the tax deficiencies are barred by the statute of limitations.

FINDINGS OF FACT

## I.  Background

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  BCO's principal office was in Montana during the years in issue.  Petitioners lived in Washington when they timely filed their petition.

Mr. Benavides graduated from Washington State University with a degree in accounting in 1971 and became a certified public accountant (C.P.A.) in 1976.  He was engaged in the business of preparing income tax returns and providing tax advice from 1976 through the years in issue.  Petitioners married before the years in issue and remained married at the time of trial.

Mr. Benavides organized BCO as a professional services corporation in 1991 under the laws of Montana and was the sole owner and manager.  A subchapter C corporation, BCO filed Forms 1120, U.S. Corporation Income Tax Return, since its organization.  During the years in issue it offered various tax and accounting services, including the preparation and filing of Federal income tax returns, accounting and advisory services, and tax advisory services.  These

**[*5]** services were performed by Mr. Benavides and three staff accountants who worked under him and at his direction during the years in issue. Mrs. Benavides performed clerical work at BCO, including data entry and some bookkeeping.

Petitioners formed Sunrise in 2000 as a partnership under the laws of Montana with Mr. Benavides as a 51% partner and Mrs. Benavides as a 49% partner. Sunrise was a real estate management and development business in Kalispell, Montana. It also acted as a bill-paying entity for three or four of BCO's clients. They would pay Sunrise, and Sunrise would pay vendors and contractors for services related to those individuals. Sunrise reported the payments it received as income and the payments it made as business expenses. Sunrise performed this same function for petitioners when they remodeled and made improvements to their home and obtained other services, paying the personal service providers for petitioners and deducting the payments as business expenses. But petitioners did not reimburse Sunrise for these expenses. Respondent determined that Sunrise paid vendors and other third parties $190,045, $208,156, and $268,609 in 2003, 2004, and 2005, respectively, for goods and services provided to petitioners or for their personal residence and for other items determined to be for petitioners' personal use or personal expenses.

**[\*6]**  Mr. Benavides also owned or controlled other LLCs and partnerships that held real property in and around the Kalispell area, including an entity called La-Jam Properties, L.P. (La-Jam).  La-Jam was a partnership owned by petitioners that acquired eight acres of land adjacent to petitioners' residence in 2004.  In 2004 Sunrise paid for construction of a 3,500-square-foot shop on La-Jam's land that petitioners used for storage.  Apart from holding the land, La-Jam did not conduct any business activities.

In 2011 Mr. Benavides entered a guilty plea to one count of assisting in the preparation of a false or fraudulent income tax return in violation of section 7206(2).  The offer of proof filed by the U.S. Attorney for the District of Montana in Mr. Benavides' criminal case stated that Mr. Benavides, through BCO, collected "fees for services" from a client, purchased a personal item for the client, and then assisted in preparing the client's tax return claiming a business expense deduction for the cost of the personal item mischaracterized as "fees."  Mr. Benavides was imprisoned for 12 months and one day, was on supervised release for one year, and paid a $25,000 fine.

II.  BCO's Tax Returns and Respondent's Determinations

BCO filed Forms 1120 for the years in issue.  Sunrise filed Forms 1065, U.S. Return of Partnership Income, for the years in issue.  Mr. Benavides or a

**[*7]** BCO employee working at his direction prepared the Forms 1120 and 1065 for 2003 and 2004; Brien Kreps, a C.P.A. who worked for BCO as its chief financial officer, prepared the Forms 1120 and 1065 for 2005. BCO reported income and expenses on the cash basis for income tax purposes. It used the accounting software Practice Time Billing Software (PACS) to account for all accounts receivable and payments. It used the Accountant's Trial Balance (ATB) program to determine its income for tax purposes.

BCO did not report as taxable income all of the payments it received for the services it provided to clients. It reported payments that were deposited into BCO accounts and entered into the ATB program; it did not report payments allocated to Mr. Benavides individually or to Sunrise or other entities that Mr. Benavides owned or controlled.

The mechanics of the payment allocations were simple. First, Mr. Benavides would decide what a client should be billed for that month (for what work and at what rate). When payments were received, Mr. Kreps would record them in PACS. Mr. Benavides reviewed all payments received and decided which payments were to be deposited into BCO accounts and which payments were to be deposited into other accounts owned or controlled by petitioners. Amounts deposited into BCO accounts then were recorded in the ATB program, typically by

[*8] Mrs. Benavides. She also typically would prepare deposit slips for the various accounts although sometimes other clerical staff prepared them.

BCO also received merchandise or services from clients in exchange for its accounting services. The merchandise or services were used by Mr. Benavides or other staff members. These were referred to as "trades" and were recorded in PACS as reductions in the client's account receivable. They were not recorded in the ATB program.

Monthly and annually, Mr. Kreps prepared spreadsheets that reconciled the accounts receivable from the two accounting systems to each client's payments. He recorded all cash receipts that were not deposited into corporate accounts but instead were deposited elsewhere or cashed. And he tracked the payments via trades and whether the trades were used by petitioners or BCO staff.

On January 3, 2014, respondent issued a notice of deficiency to BCO for tax years 2003, 2004, and 2005. Respondent determined that BCO understated its gross income by failing to report the funds diverted from BCO to petitioners and entities they owned or controlled, as well as the trade items petitioners converted to personal use, in the following amounts: $195,359 for 2003, at least $102,584

[*9] for 2004,[3] and $215,580 for 2005 (collectively, diverted gross receipts). Respondent determined the amounts of the diverted gross receipts by performing a bank deposit analysis of BCO's bank records, reviewing its corporate and financial records, and interviewing its clients and employees. BCO's adjusting journal entries from its general ledger showed that it had retained earnings of at least $49,977 for 2003 and $65,639 for 2004 without taking into account the diverted gross receipts.

BCO claimed NOL deductions of $114,280 and $50,026 for 2004 and 2005, respectively. At the beginning of 2002 BCO reported accumulated NOL carryovers of $70,822 attributable to NOLs in 1996 and 1997. BCO claimed increases in NOLs of $43,513 for 2002 and $61,859 for 2003. Through a bank deposit analysis respondent determined that BCO had underreported its income by $131,994 for 2002, which would have eliminated the NOL that BCO claimed for that year and also extinguished the accumulated NOL carryovers from 1996 and 1997. Likewise the underreported income for 2003 from the diverted gross receipts would have eliminated the NOL that BCO claimed for that year. In the notice of deficiency respondent disallowed the NOL carryover deductions claimed

---

[3] Respondent did not seek to increase the deficiency to include in BCO's 2004 unreported income the $30,000 payment from Jeff Sorg to BCO that was diverted to Sunrise.

[*10] for 2004 and 2005. Additionally, respondent determined section 6663(a) fraud penalties of $35,044, $64,802, and $69,722 for 2003, 2004, and 2005, respectively.

The largest recipient of BCO's diverted gross receipts was Sunrise. Respondent, in the notices of deficiency issued to petitioners, reduced Sunrise's income by $98,986, $136,648, and $203,489 for 2003, 2004, and 2005, respectively, to remove the amounts he determined had been diverted from BCO to Sunrise. Respondent did not remove deposits from clients using Sunrise as a bill-paying entity or disallow business expense deductions for Sunrise's payments on behalf of those individuals.

## III. Petitioners' Tax Returns and Respondent's Determinations

Petitioners timely filed Forms 1040, U.S. Individual Income Tax Return, for the years in issue. Mr. Benavides prepared those returns, and petitioners signed them under penalty of perjury. Petitioners reported adjusted gross income of $157,656, $194,882, and $236,032 for tax years 2003, 2004, and 2005, respectively. Petitioners did not report the diverted gross receipts from BCO as qualified dividends on their joint returns.

The Internal Revenue Service (IRS) audited petitioners' joint returns for the years in issue. In the course of the audit the agent examining petitioners' returns

[*11] determined that section 6663(a) fraud penalties were warranted and prepared a Form 11661, Fraud Development Recommendation--Examination, recommending fraud penalties for 2003, 2004, and 2005.[4] The Form 11661 describes the alleged fraud, including that Mr. Benavides "purposefully did not report the income * * * [diverted from BCO] on the appropriate tax returns in order to evade the personal service corporate tax and the additional tax on dividends to him from the corporation." The "Plan of Action" on the Form 11661 was to "[c]omplete 30 day letter writeup, including civil fraud penalty." The Form 11661 referred only to Mr. Benavides. The agent prepared a separate Form 11661 for BCO although it does not specify preparation of a 30-day letter as a part of the action plan.

On October 26, 2011, the examining agent's supervisor signed the Forms 11661, indicating approval of the recommended fraud penalties. Respondent issued revenue agent reports (RARs) on January 25, 2012, to BCO and to petitioners, communicating the section 6663(a) fraud penalties. Those RARs were later amended.

---

[4] We explain why we are reopening the record to include certain exhibits relevant to respondent's penalty determination infra pp. 40-47.

[*12] On January 3, 2014, respondent issued the notice of deficiency to petitioners for tax years 2003, 2004, and 2005. Respondent determined that petitioners understated their gross income by failing to report the diverted gross receipts from BCO as dividends of $195,359, $132,584, and $215,580 for the tax years 2003, 2004, and 2005, respectively. In addition respondent determined that petitioners understated their income from Sunrise, making four adjustments: (1) decreasing Sunrise's gross income by the amounts determined to be diverted to Sunrise from BCO, (2) disallowing Sunrise's depreciation deductions that respondent determined were for assets not shown to be used in an active trade or business, (3) disallowing Sunrise's section 179 expense deductions for 2004 and 2005 because the assets were not shown to be used in conducting an active trade or business, and (4) disallowing certain business expense deductions claimed by Sunrise that respondent identified as petitioners' personal expenses paid by Sunrise. Together these adjustments resulted in increased flowthrough income from Sunrise to petitioners. Respondent then adjusted petitioners' self-employment income to account for these adjustments in ordinary income flowing from Sunrise to petitioners. Respondent also made corresponding computational adjustments to petitioners' adjusted gross income, itemized deductions, and exemptions. Lastly, respondent determined section 6663(a) fraud penalties of

[*13] $27,029, $19,221, and $27,170, for tax years 2003, 2004, and 2005, respectively, with respect to the unreported constructive dividends from BCO.

OPINION

I. Burden of Proof

The taxpayer generally bears the burden of proving that the Commissioner's determinations in a notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). For unreported income, however, the Court of Appeals for the Ninth Circuit, where these cases are appealable absent a stipulation to the contrary, generally requires that the Commissioner introduce some evidence linking the taxpayer with income-producing activity or demonstrate that the taxpayer actually received unreported income. See Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985); Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982). Once the Commissioner makes this required threshold showing, the taxpayer must prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. Helvering v. Taylor, 293 U.S. 507, 515 (1935); Rapp v. Commissioner, 774 F.2d at 935; Tokarski v. Commissioner, 87 T.C. 74 (1986). Taxpayers also bear the burden of proving entitlement to any deductions claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440

[*14] (1934). BCO and petitioners do not contend, and the evidence does not establish, that the burden of proof should shift to respondent under section 7491(a) as to any issue of fact.

## II. BCO's Arguments

### A. Unreported Income of BCO

The first issue is whether BCO had unreported income from its accounting and tax preparation business of $195,359, $102,584, and $215,580 for tax years 2003, 2004, and 2005, respectively. Respondent asserts that Mr. Benavides diverted gross receipts from BCO in these amounts during the respective years in issue and therefore BCO failed to report and pay Federal corporate income tax on these amounts.

A C corporation is a separate entity for Federal income tax purposes so long as it engages in some legitimate business activity. Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). As an independent taxable entity, a C corporation is subject to Federal income tax on its taxable income. Sec. 11(a). The C corporation's taxable income is its gross income--which includes fees for services--less allowable deductions. Secs. 61(a)(1) and (2), 63(a).

Petitioners do not dispute that the gross receipts were BCO's income; Mr. Benavides readily admits he "redirected" gross receipts from BCO to put "right

[*15] away" into his other entities. Thus, the diverted income--$195,359, $102,584, and $215,580 for 2003, 2004, and 2005, respectively--in the form of checks, cash payments, or trades is gross income of BCO.

Mr. Benavides argues, however, that we should ignore these transfers because he would have "stripped" the profits out anyway as deductible compensation. We disagree. While BCO could have taken the gross receipts into account as income and paid them out as compensation, by Mr. Benavides' own admission it did not. The diverted gross receipts therefore are properly characterized as distributions, not compensation.

A taxpayer may not avoid Federal income tax on earned income simply by assigning it to another. Helvering v. Horst, 311 U.S. 112, 119 (1940) ("The dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid."); Floyd v. Scofield, 193 F.2d 594, 596 (5th Cir. 1952) (holding a corporation liable for corporate tax on income from the sale of oil and gas despite liquidation plan that distributed accounts receivable to shareholders when checks were delivered before dissolution). We hold that the diverted gross receipts were the unreported taxable income of BCO for the years in issue. See, e.g., United Mercantile Agencies, Inc. v. Commissioner, 23 T.C. 1105, 1112 (1955) ("[D]iverted funds are

[*16] taxable as income to the corporation and are taxable as dividends to the extent of earnings and profits to the officer-stockholders receiving them."), remanded on other grounds sub nom. Drybrough v. Commissioner, 238 F.2d 735 (6th Cir. 1956); Mazzocchi Bus Co. v. Commissioner, T.C. Memo. 1993-43 (sustaining the Commissioner's deficiency determination when the controlling shareholder diverted corporate income to himself that the corporation failed to report on its tax return), aff'd, 14 F.3d 923 (3d Cir. 1994).

### B. BCO's Claimed NOL Deductions

A taxpayer generally may deduct, as an NOL for a taxable year, an amount equal to the sum of the NOL carryforwards and carrybacks to that year. Sec. 172(a). An NOL is the excess of deductions over gross income, computed with certain modifications specified in section 172(d). Sec. 172(c). Absent an election under section 172(b)(3), an NOL for any taxable year first must be carried back 2 years and then carried forward 20 years. Sec. 172(b)(1)(A), (2) and (3).

Taxpayers bear the burden of establishing both the existence of NOLs from prior years and the amounts that may be carried forward to the tax years in issue. See Rule 142(a); Keith v. Commissioner, 115 T.C. 605, 621 (2000). We have jurisdiction to determine the correct amount of taxable income or NOL for a year not in issue as a preliminary step in determining the correct NOL carryover to a

[*17] year before us.  Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974), aff'd without published opinion, 510 F.2d 970 (3d Cir. 1975).

The only evidence BCO offered to substantiate its NOLs consisted of its tax returns for the tax years in issue with attached statements briefly describing how it calculated its NOL carryovers, a handwritten summary of its historical gross receipts and NOLs that Mr. Benavides prepared shortly before trial, and Mr. Benavides' vague testimony that he disagreed with respondent's position.

We did not find Mr. Benavides' testimony credible in any respect.  And BCO's tax returns for the years in issue are merely statements of its position.  They cannot be used to substantiate a claimed deduction including the amount of an NOL to be carried forward.  See Sparkman v. Commissioner, 509 F.3d 1149, 1156-1157 (9th Cir. 2007), aff'g T.C. Memo. 2005-136; Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Hawks v. Commissioner, T.C. Memo. 2005-155, 2005 WL 1503686, at *3.  BCO therefore failed to substantiate the NOLs for 1996, 1997, and 2002.  Nor did BCO show that these alleged NOLs were not already exhausted before the years in issue.  See Jones v. Commissioner, 25 T.C. 1100, 1104 (1956), rev'd and remanded on other grounds, 259 F.2d 300 (5th Cir. 1958); Power v. Commissioner, T.C. Memo. 2016-157, at *13-*14 ("Petitioners must prove not only that Mr. Power incurred NOLs in 1999-2002 but

[*18] also that the NOLs were not absorbed during the period beginning with 1997 (the earliest carryback year) and ending with 2006 (the last year before the first taxable year in issue)."); Leitgen v. Commissioner, T.C. Memo. 1981-525, 1981 WL 10937 ("The burden is on petitioners to prove their incomes for 1969, 1970, and 1971 in order to show that there was any part of the alleged 1972 loss that would not have been absorbed in the three preceding years and that could have been carried over to the years in issue."), aff'd, 691 F.2d 504 (8th Cir. 1982). The evidence shows that BCO's diverted gross receipts, if reported for 2003, would have produced taxable income, not an NOL. The IRS examiner's bank deposit analysis showed that BCO had unreported gross receipts for 2002 as well that, if reported, would have produced taxable income for 2002, even after fully exhausting the claimed--but unsubstantiated--NOL carryovers from 1996 and 1997. Accordingly, we sustain respondent's disallowance of BCO's NOL carryover deductions to 2004 and 2005.

III. Petitioners' Arguments

A. Diverted Gross Receipts as Constructive Dividends

When a C corporation distributes money or property to a shareholder out of the corporation's earnings and profits (E&P), the amount of the distribution constitutes a dividend that must be included in the shareholder's taxable income.

**[*19]** Secs. 61(a)(7), 63, 301(a), (c), 316. If the distribution exceeds the corporation's E&P, the excess generally represents a nontaxable return of capital to the extent of the shareholder's basis in the stock, and any remaining amount is taxable to the shareholder as a gain from the sale or exchange of property. Sec. 301(c); Truesdell v. Commissioner, 89 T.C. 1280, 1294-1295 (1987).

Dividends for tax purposes are not always declared in the formal sense; courts have identified constructive dividends when a C corporation confers an economic benefit upon a shareholder without a corresponding expectation of repayment. See Hood v. Commissioner, 115 T.C. 172, 179-180 (2000); Cordes v. Commissioner, T.C. Memo. 2002-124, 2002 WL 1023173, at *10 (citing Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980) ("There is no requirement that the dividend be formally declared or even intended by the corporation.") and Wortham Mach. Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975)). Similarly, when a shareholder diverts earned income from his closely held C corporation for his personal use, courts have held that the diverted income constitutes a constructive distribution to the shareholder. Simon v. Commissioner, 248 F.2d 869, 876-877 (8th Cir. 1957) ("The corporation is liable for a substantial tax upon the diverted income it failed to report. Further tax will be collected from

[*20] taxpayers under the constructive dividend theory."), rev'g T.C. Memo. 1955-194; Truesdell v. Commissioner, 89 T.C. at 1300-1301.

Petitioners bear the burden of proving that BCO had insufficient E&P to support the amounts of constructive dividends respondent determined for the tax years in issue. E.g., Truesdell v. Commissioner, 89 T.C. at 1295-1296; Pittman v. Commissioner, T.C. Memo. 1995-243, 1995 WL 329854, at *12, aff'd, 100 F.3d 1308 (7th Cir. 1996). They failed to present credible evidence showing that BCO lacked sufficient E&P to support dividend treatment. At trial petitioners pointed to a handwritten summary of BCO's retained earnings from 1996 to 2008, and Mr. Benavides testified, consistent with that summary, that BCO never had retained earnings during that period. We did not find Mr. Benavides credible, and we are not required to accept his self-serving testimony. See Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), aff'g T.C. Memo. 1969-48; Monahan v. Commissioner, 109 T.C. 235, 257 (1997). Moreover, other evidence refutes his bald assertion.

Adjusting journal entries in 2003 and 2004 showed that BCO had retained earnings of at least $49,977 as of 2003 and $65,639 as of 2004 even without taking into account the diverted gross receipts. This, coupled with the bank deposit analysis showing that BCO had significant unreported income for 2002, is

[*21] persuasive evidence that BCO began the tax years in issue with accumulated E&P. And the diverted gross receipts, if properly reported as BCO's income for the years in issue, would have generated current E&P during those years. See sec. 1.312-6(b), Income Tax Regs. Therefore, we hold that the diverted gross receipts from BCO of $195,359, $132,584, and $215,580 are taxable to petitioners as constructive dividends for 2003, 2004, and 2005, respectively. See sec. 316; Pittman v. Commissioner, 1995 WL 329854, at *13-*14.

B. Unreported Income From Sunrise

Next, respondent determined that petitioners had unreported income from Sunrise of $123,931, $88,593, and $66,628 for tax years 2003, 2004, and 2005, respectively, arising from four adjustments. We consider each adjustment in turn.

1. Gross Receipts Adjustments

Respondent determined that Sunrise erroneously reported the diverted gross receipts from BCO as its own gross income for each tax year, which then flowed through to petitioners as partners. To avoid double-counting, respondent reduced the gross income flowing from Sunrise to petitioners for each year by the amount determined to be BCO's gross receipts. At trial Mr. Benavides admitted to diverting gross receipts from BCO to Sunrise for each tax year but stated that the amounts diverted were different from respondent's determination, asserting that

[*22] respondent gave petitioners <u>too much</u> of a reduction in income from Sunrise. Mr. Benavides was not a credible witness, and no credible evidence supports a change to respondent's determinations.

### 2. Disallowed Deductions

A taxpayer may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Sec. 162. But personal, living, and family expenses are not deductible. Sec. 262. For an expenditure to be an ordinary and necessary business expense, generally the taxpayer must show a bona fide business purpose for the expenditure and a proximate relationship between the expenditure and the business of the taxpayer. <u>See</u> <u>Challenge Mfg. Co. v. Commissioner</u>, 37 T.C. 650, 660-661 (1962); <u>see also</u> sec. 1.162-1(a), Income Tax Regs.

Taxpayers are required to maintain sufficient records to establish the amount and purpose of any deduction. Sec. 6001; <u>Higbee v. Commissioner</u>, 116 T.C. 438, 440 (2001); sec. 1.6001-1(a), (e), Income Tax Regs. At trial Mr. Benavides made a disorganized and confusing presentation that often left us struggling to identify the specific expenditure he intended to explain. He presented the general ledgers of Sunrise and depreciation schedules but did not offer any supporting records for any of the expenses or deductions. <u>See</u> <u>Lyseng v.</u>

[*23] Commissioner, T.C. Memo. 2011-226, 2011 WL 4389644, at *3 ("In general, taxpayers must substantiate claimed deductions with evidence such as invoices or receipts that establish that the expenses were actually incurred[.]"). Repeatedly, Mr. Benavides challenged adjustments made by the IRS in RARs that predated the notice of deficiency (and had been conceded in that notice) instead of directing the Court to evidence of the remaining expenses. He fell back on his excuse that he was not represented by counsel, yet when confronted by questions from respondent he demonstrated a sophisticated appreciation for the issues. And, as noted above, in general, we did not find Mr. Benavides to be a credible witness.

### a. Disallowed Depreciation and Section 179 Expenses

Petitioners assert that respondent incorrectly disallowed depreciation deductions that flowed through to their returns from Sunrise of $32,872, $17,085, and $11,498 for 2003, 2004, and 2005, respectively, and section 179 deductions that flowed through from Sunrise of $34,961 and $55,016 for 2004 and 2005, respectively.

A reasonable depreciation deduction may be allowed for the "exhaustion, wear and tear" of property used in a trade or business. Secs. 161, 167(a)(1). To substantiate entitlement to a depreciation deduction, a taxpayer not only has to show that the property was used in a business but also must establish the

[*24] property's depreciable basis by showing the cost of the property, its useful life or recovery period, and its previously allowable depreciation. See, e.g., Cluck v. Commissioner, 105 T.C. 324, 337 (1995). A taxpayer with no capital investment in property has no right to depreciation deductions with respect to that capital asset. Miller v. Commissioner, 68 T.C. 767, 775 (1977).

Certain taxpayers may elect instead to treat the cost of certain property used in an active trade or business as a current expense in the year that property is placed in service. Sec. 179(a), (d). If the property is used for both business and other purposes, then the portion of the cost that is attributable to the business use is eligible for expensing under section 179 but only if more than 50% of the use is for business purposes (predominant use requirement). See sec. 1.179-1(d), Income Tax Regs.

Heightened substantiation requirements apply to deductions for certain assets. Sec. 274(d); see, e.g., Mears v. Commissioner, T.C. Memo. 2013-52, at *22 (considering section 274(d) "listed property" requirements with respect to applicable section 167 deductions); Singh v. Commissioner, T.C. Memo. 2009-36, 2009 WL 349745, at *1 (considering listed property requirements with respect to an applicable section 179 deduction). Passenger automobiles and other property used as a means of transportation are listed property. Sec. 280F(d)(4)(A)(i)

**[*25]** and (ii). Listed property also broadly includes any property of a type generally used for entertainment, recreation, or amusement. Sec. 280F(d)(4)(A)(iii). To deduct expenses related to listed property taxpayers must support their own statements with additional substantiation that adequately establishes the amount, time, place, and business purpose of each expenditure. Sec. 274(d)(4); see also sec. 1.274-5T(b)(6), (c)(1) and (2), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985).

At trial petitioners presented a depreciation schedule that summarized assets depreciated or expensed under section 179 for the tax years in issue. The assets include several trucks, an all-terrain vehicle (ATV), lawn maintenance equipment, a camping trailer, and assorted equipment. Petitioners offered no documentary evidence to support their depreciation schedule. For instance, no evidence before us establishes who purchased the assets, when they were purchased, what they cost, and whether depreciable bases remained during the tax years in issue.

What is more, petitioners failed to establish that these assets were predominantly used in Sunrise's real estate management and development business. Mr. Benavides was vague. He testified, for instance, that the ATV was used to show real property for sale, but there is no evidence that Sunrise ever marketed, showed, or even listed property for sale during the years in issue. Mr.

[*26] Benavides also asserted that the trucks on the depreciation schedule were related to Sunrise's business because people "don't buy big trucks just for sport". That assertion defies logic. He admitted to personal use of some of the assets, such as the lawn equipment and the camping trailer. Not only did petitioners fail to satisfy the strict substantiation requirements for their listed property; they failed to offer enough evidence to substantiate their deductions under a general standard. We, therefore, sustain respondent's disallowance of the depreciation and section 179 expense deductions.

### b. Disallowed Business Expense Deductions

Respondent disallowed other business expense deductions claimed by Sunrise that respondent identified as expenditures for petitioners' personal use or as unsubstantiated. The amounts disallowed were $190,045, $208,156, and $268,609 for 2003, 2004, and 2005, respectively.

Petitioners argue that respondent incorrectly disallowed deductions for Sunrise's legitimate operating expenses and expenses incurred for paying bills for others (bill-paying expenses). All we have in support of petitioners' claims are Mr. Benavides' muddled testimony and Sunrise's general ledgers, which contain limited information and are unsupported by any other evidence. The record is devoid of receipts, invoices, canceled checks, or other business records to

[*27] substantiate the reported deductions or petitioners' claimed reimbursements even though Mr. Benavides' demeanor at trial indicated that he understood the need to have such backup. Frustrating us further, petitioners repeatedly tried to prove their entitlement to these deductions by pointing out problems with RARs that preceded the notice of deficiency and were addressed in the notice of deficiency.

First, petitioners assert that respondent incorrectly disallowed some of Sunrise's operating expense deductions for each year, including automobile expenses, insurance, property taxes, and payroll expenses. Petitioners did not describe in sufficient detail the specific nature of the various operating expenses, let alone substantiate them with any records. For example, Mr. Benavides testified to paying wages to an employee, but the individual worked for BCO, not Sunrise. Without credible records, we cannot conclude that petitioners are entitled to claim deductions for any of these alleged expenses.

Second, petitioners assert that Sunrise was paying the construction costs for some of BCO's clients, for La-Jam, and for petitioners themselves, for which Sunrise would be reimbursed but would not profit. Petitioners argue that respondent incorrectly disallowed some of Sunrise's bill-paying expense deductions because Sunrise later would be reimbursed, reimbursement income and

[*28] expenses for the years in issue "should wash", and respondent failed to match up all income and expenses in the audit. Mr. Benavides testified that some of Sunrise's expenses that respondent identified as petitioners' personal expenses and disallowed as deductions for 2004 were amounts that Sunrise paid for the construction of La-Jam's shop, but he did not identify the exact expenditures or their amounts or provide credible evidence that Sunrise was reimbursed by La-Jam or petitioners.

The evidence shows that respondent allowed the bill-paying expense deductions except as they relate to petitioners' personal expenses or to La-Jam's expenses. And there is no evidence that petitioners (or La-Jam) reimbursed Sunrise. In any event, petitioners' argument that everything "should wash" is not a substitute for showing that they did wash or substantiating the business expenses Sunrise reported. Petitioners provided no documentary evidence to prove what these alleged expenses were, their various amounts, or when, or even if, they were actually incurred. Moreover, petitioners failed to show that the disallowed bill-paying expense deductions bore any relation to Sunrise's trade or business. Many of the bill-paying expenses are personal, such as the hundreds of thousands of dollars spent to remodel petitioners' principal residence, as well as the money spent to build La-Jam's shop directly adjacent to petitioners' home. Accordingly,

[*29] we will sustain respondent's disallowance of Sunrise's business expense deductions of $190,045, $208,156, and $268,609 for tax years 2003, 2004, and 2005, respectively.

C. Self-Employment Income Adjustments

The next issue is whether Mr. Benavides had unreported self-employment income in the amounts of his shares of partnership income from Sunrise of $42,219, $110,332, and $82,591 for tax years 2003, 2004, and 2005, respectively; and similarly, whether Mrs. Benavides had unreported self-employment income in the amounts of her shares of partnership income from Sunrise of $40,564, $106,006, and $79,352 for tax years 2003, 2004, and 2005, respectively.

Section 1401 imposes a tax upon a taxpayer's self-employment income. Self-employment income means the "net earnings from self-employment" derived by an individual during the taxable year. Sec. 1402(b). Subject to exceptions, the "net earnings from self-employment" include a partner's distributive share of partnership trade or business income. Sec. 1402(a).

Because Mr. and Mrs. Benavides own Sunrise as partners (51% and 49%, respectively), all of Sunrise's trade or business income flows to them on account of their partnership interests. Secs. 701 and 702(a). Accordingly, all such income for any taxable year generally, subject to limitations of section 1402(b), would be

[*30] subject to self-employment taxes. Secs. 1401(a) and (b), 1402(a) and (b); Norwood v. Commissioner, T.C. Memo. 2000-84, 2000 WL 267779, at *1 (citing Cokes v. Commissioner, 91 T.C. 222, 229-230 (1988)). At trial petitioners agreed that the adjustments to self-employment income would depend upon our rulings with respect to the other joint return determinations and did not advance any separate argument--at trial, on brief, or otherwise--concerning their self-employment income or respondent's determinations. As we have sustained respondent's determinations that petitioners had additional income from Sunrise for each year in issue, that additional income constitutes self-employment income. See secs. 1401(a) and (b), and 1402(a) and (b). Accordingly, we will sustain respondent's determinations concerning self-employment taxes for each year.

IV. Fraud

A. Section 6663(a) Fraud Penalty

Section 6663(a) provides: "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." Fraud, for Federal tax purposes, is an intentional wrongdoing on the part of a taxpayer with the specific purpose to evade a tax believed to be owed. Sadler v. Commissioner, 113 T.C. 99, 102 (1999). The fraud penalty is a civil sanction

[*31] provided primarily as a safeguard for protection of revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938); Sadler v. Commissioner, 113 T.C. at 102.

Respondent determined section 6663(a) fraud penalties of $35,044, $64,802, and $69,722 for 2003, 2004, and 2005, respectively, with respect to BCO's unreported taxable income for those years. Respondent determined section 6663(a) fraud penalties of $27,029, $19,221, and $27,170 for 2003, 2004, and 2005, respectively, with respect to petitioners' failure to report dividends from BCO for those years. Respondent bears the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). Respondent must satisfy his burden separately for each petitioner filing the joint returns. See sec. 6663(c); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), aff'd, 470 F.2d 87 (1st Cir. 1972); Said v. Commissioner, T.C. Memo. 2003-148, 2003 WL 21205252, at *6 ("Under section 6663(c), the fraud penalty is imposed on each spouse separately, even when a joint return is filed[.]"), aff'd, 112 F. App'x 608 (9th Cir. 2004).

To carry his burden of proof, respondent must show, for each year, that: (1) an underpayment of tax exists and (2) some portion is attributable to fraud. See Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). An underpayment for a

[*32] year is attributable to fraud if petitioners intended to conceal, mislead, or otherwise prevent the collection of taxes known or believed to be owing.  See Katz v. Commissioner, 90 T.C. 1130, 1143 (1988).  If respondent establishes that any portion of the underpayment for a year is attributable to fraud, the entire underpayment for that year shall be attributable to fraud and subject to a 75% penalty, except with respect to any portion that petitioners establish (by a preponderance of the evidence) is not attributable to fraud.  See sec. 6663(a) and (b).

### 1.  Underpayment of Tax

First, respondent must meet his burden of showing an underpayment of tax for each of the years in issue.  Respondent alleges fraudulent underpayments of tax by BCO and petitioners with respect to tax owed as a consequence of the diverted gross receipts from BCO.  At trial Mr. Benavides admitted to diverting $100,489, $92,764, and $167,225 of BCO's gross receipts to Sunrise in 2003, 2004, and 2005, respectively,[5] and we have held supra pp. 14-16 (BCO) and pp. 18-21

---

[5] We note that Mr. Benavides admitted to diverting gross receipts in amounts slightly different from those determined by respondent (and found by this Court), but the critical point is that petitioners did not dispute BCO's diverted gross receipts.  Computations attached to the notices of deficiency show that those diverted gross receipts resulted in some underpayments of tax at the corporate and shareholder levels.  Form 4549B, Income Tax Examination Changes, issued to

(continued...)

**[\*33]** (petitioners) that those diverted gross receipts are taxable income to BCO and taxable constructive dividends to petitioners. Hence it is not difficult to conclude that respondent has carried his burden of showing some underpayments of tax with respect to BCO and petitioners. Specifically, respondent showed that BCO understated its taxable income by failing to report the diverted gross receipts as corporate income of $195,359, $102,584, and $215,580 for 2003, 2004, and 2005, respectively, and by erroneously claiming NOL carryforward deductions for 2004 and 2005; and petitioners understated their taxable income by failing to report the diverted gross receipts from BCO as constructive dividends of $195,359, $132,584, and $215,580 for 2003, 2004, and 2005, respectively. Consequently, respondent has established that both BCO and petitioners underpaid their tax for 2003, 2004, and 2005.

### 2. Fraudulent Intent

Next, we must determine whether BCO and petitioners had fraudulent intent. The existence of fraud is a factual question, resolved upon consideration of the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C.

---

[5](...continued)
petitioners shows that even after reducing Sunrise's gross receipts by the amounts of the diverted dividends petitioners underreported income flowing through from Sunrise. That underreported income was added to the underreported income from the constructive dividends from BCO.

[*34] 511, 516 (1992). Fraud may not be presumed or based upon mere suspicion. Petzoldt v. Commissioner, 92 T.C. 661, 699-700 (1989). But because direct evidence of fraudulent intent is seldom available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). The taxpayer's entire course of conduct may be indicative of fraudulent intent. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); Stone v. Commissioner, 56 T.C. 213, 224 (1971).

Courts routinely consider whether the following "badges of fraud" are present: (1) understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, (9) dealing in cash, and (10) failing to make estimated payments. See, e.g., Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d at 307; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); see also McGraw v. Commissioner, 384 F.3d 965, 971 (8th Cir. 2004) (citing Spies, 317 U.S. at 499, and Bradford v. Commissioner, 796 F.2d at 307-308), aff'g Butler v. Commissioner, T.C. Memo.

**[\*35]** 2002-314. This list is nonexclusive, and no single factor is dispositive, although the combination of several factors may constitute persuasive evidence of fraud. Petzoldt v. Commissioner, 92 T.C. at 700.

A corporation acts only through its officers and cannot escape responsibility for their acts in that capacity. DiLeo v. Commissioner, 96 T.C. at 875. Whether BCO's intent was fraudulent therefore depends upon the intent of Mr. Benavides, its sole owner and manager. See Ruidoso Racing Ass'n, Inc. v. Commissioner, 476 F.2d 502, 506 (10th Cir. 1973) (fraud of majority shareholder imputed to corporation because corporation received tax benefit from shareholder's fraudulent acts to understate corporate gross income), aff'g in part, remanding in part T.C. Memo. 1971-194; DiLeo v. Commissioner, 96 T.C. at 875; Federbush v. Commissioner, 34 T.C. 740, 749 (1960) (fraud of shareholder-officers in diverting corporate income to evade corporate tax imputed to corporation when officers owned five-sixths of stock), aff'd, 325 F.2d 1 (2d Cir. 1963); Door Control Servs. Inc. v. Commissioner, T.C. Memo. 1996-508 (corporate taxpayer fraudulently intended to underpay taxes when it substantially understated its tax liability by failing to report income diverted to its only two shareholders who were also its only officers).

**[\*36]**                    a.  BCO and Mr. Benavides

We now turn to the badges of fraud.  First, the diverted gross receipts from BCO demonstrate a pattern of consistent underreporting of income by both BCO and Mr. Benavides, evidencing their intent to evade both corporate tax and tax on dividends.  And while a "mere understatement of income alone is not sufficient to prove fraud, the consistent and substantial understatement of income is, by itself, strong evidence of fraud."  Truesdell v. Commissioner, 89 T.C. at 1302 (finding fraud when sole shareholder diverted corporate funds to shareholder's personal use during three tax years and failed to report on corporate or individual returns); Otsuki v. Commissioner, 53 T.C. 96, 107-108 (1969) (holding that a pattern of omission of gross receipts for five years was "strong evidence of an attempt to defraud the Government"); see also Potter v. Commissioner, T.C. Memo. 2014-18, at \*9 ("A pattern of substantially underreporting income for multiple years is strong evidence of fraud[.]") (citing Vanover v. Commissioner, T.C. Memo. 2012-79, 2012 WL 952871, at \*4).

Second, BCO and petitioners failed to maintain adequate records.  BCO maintained two sets of books to track payments BCO received--one for tracking accounts receivable and one for tax reporting--and the diverted amounts were not reported on the books used for BCO's tax reporting or BCO's tax returns.  Mr.

[*37] Benavides was instrumental in BCO's double bookkeeping practices and its failure to deposit all of its gross receipts into BCO accounts and petitioners' failure to report the resulting dividends from BCO.

Third, the two sets of books also indicate an effort to conceal taxable income. Potter v. Commissioner, at *11 (stating that double bookkeeping at corporate taxpayer was used to conceal shareholder's diverting corporate receipts and was "clear circumstantial evidence of fraudulent intent").

Fourth, Mr. Benavides' criminal conviction--while not identical to the fraud alleged here--is nonetheless indicative of his fraudulent intent vis-a-vis the IRS and Federal income taxes. In 2011 Mr. Benavides pleaded guilty and was convicted of assisting in the preparation of a false or fraudulent income tax return in violation of section 7206(2). The parties stipulated the offer of proof, which states that Mr. Benavides used BCO to collect "fees for services" from a client, purchased a personal item for the client, then assisted in preparing the client's tax return claiming a business expense deduction for the cost of the personal item mischaracterized as "fees". Here too Mr. Benavides intentionally used BCO's operations to avoid taxes--this time for BCO's and petitioners' benefit--diverting BCO's income to hide it from the IRS.

[*38] Lastly, BCO and Mr. Benavides provided inconsistent and implausible explanations for their actions. For example, Mr. Benavides disavows any fraudulent intent, arguing that, while he may have "redirected" BCO's gross receipts, the income was reported "somewhere"--whether on petitioners' joint returns or the returns of one of petitioners' businesses. This, Mr. Benavides argues, indicates a lack of fraudulent intent. Mr. Benavides also protests that it is "rather silly" to suggest that petitioners were trying to evade corporate tax because he was just paying reasonable compensation to himself--a process he described to the Court as "stripping" the taxable income out of BCO.

Mr. Benavides admits to "hurried, short-circuited bookkeeping practices," but argues that he intended only to engage in legitimate tax planning by paying himself a reasonable salary. But BCO's principal business was tax preparation and accounting services; Mr. Benavides--as a C.P.A. with an accounting degree and decades of experience in tax matters--thus should know he cannot just ignore the separate existence of BCO. See Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984) (holding that taxpayer's knowledge and experience as a C.P.A. whose business was handling tax matters for others supported a finding of fraud), aff'g per curiam T.C. Memo. 1982-603; Franke v. Commissioner, T.C. Memo. 2011-10 (stating that taxpayer's business experience as a tax preparer for

**[\*39]** several years was a relevant consideration in determining whether he had fraudulent intent).

To suggest that taxpayers who made a living handling the tax and accounting matters of others should escape the fraud penalty because of sloppy bookkeeping--itself a badge of fraud--is risible. The "reasonable compensation" argument advanced by Mr. Benavides is a dog that will not hunt. He did not report the diverted gross receipts on his personal returns as compensation from BCO or pay applicable self-employment taxes. He cannot ignore reality or rewrite history now that he has been caught out. Mr. Benavides' intentioned steps to lower BCO's taxable income (as well as his own) are clear and convincing evidence of the requisite fraudulent intent for BCO and Mr. Benavides alike. We find ample indicia of fraud for BCO and Mr. Benavides for each of the tax years in issue.

### b. Mrs. Benavides

Although Mrs. Benavides filed joint returns with Mr. Benavides, to establish her liability for the fraud penalties respondent must show that some portions of the underpayments were due to her fraud. See sec. 6663(c). The record shows that her involvement with BCO and Sunrise was more limited. Unlike her husband, Mrs. Benavides was not a C.P.A. with decades of tax

[*40] experience, nor was she an owner or manager of BCO.  During the years in issue she performed clerical tasks at BCO, such as data entry and bookkeeping, making entries in the ATB program, preparing deposit slips, and depositing funds into BCO's and other "various" accounts.  While these tasks, together with her relationship with Mr. Benavides, suggest that she may have known of the diverted gross receipts, we will not presume so without additional indicia of fraud.  Therefore, we hold that respondent has not carried his burden of showing by clear and convincing evidence that Mrs. Benavides had fraudulent intent.

B.  Section 6751

For certain penalties asserted against individual taxpayers, including fraud, the Commissioner must show that he complied with the procedural requirements of section 6751(b)(1).  Sec. 7491(c); Graev v. Commissioner (Graev III), 149 T.C. 485, 492-493 (2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C. 460 (2016).  Section 6751(b)(1) requires the Commissioner to show that the initial determination of certain penalties was "personally approved (in writing) by the immediate supervisor of the individual making such determination".  See Graev III, 149 T.C. at 493; see also Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42.

[*41] Trial was held, and the record was closed before the issuance of our Opinion in Graev III, which overruled in part our decision in Graev II and held that the Commissioner's burden of production under section 7491(c) includes showing supervisory approval as required by section 6751(b)(1). In the light of the Court's decision in Graev III, we ordered the parties to address the effect of section 6751(b)(1) on these cases and to direct the Court to any evidence of section 6751(b)(1) supervisory approval in the record. Respondent was unable to direct the Court to any evidence in the record that satisfies his burden of production with respect to section 6751(b)(1) and filed a motion to reopen the record to include a completed Form 11661, signed by the examining agent's supervisor, a Penalty Approval Form signed by the supervisor, and declarations by the revenue agent who recommended the penalties and the revenue agent's supervisor who approved them. Petitioners objected to respondent's motion.

We first must determine whether to reopen the record to admit the additional evidence that respondent offered. The decision to reopen the record to admit additional evidence is within our broad discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331-332 (1971); see Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974) ("[T]he Tax Court's ruling [denying a motion to reopen the record] is not subject to review except upon a

[*42] demonstration of extraordinary circumstances which reveal a clear abuse of discretion."), aff'g T.C. Memo. 1971-200.  We "will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, the evidence is material to the issues involved, and the evidence probably would change the outcome of the case."  Butler v. Commissioner, 114 T.C. 276, 287 (2000); see also SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986) (trial court "should take into account, in considering a motion to hold open the trial record, the character of the additional * * * [evidence] and the effect of granting the motion"), overruled on other grounds by Pinter v. Dahl, 486 U.S. 622 (1988).  We also balance the moving party's diligence against the possible prejudice to the nonmoving party.  In particular we consider whether reopening the record after trial would prevent the nonmoving party from examining and questioning the evidence as it would have during the proceeding. Estate of Freedman v. Commissioner, T.C. Memo. 2007-61, 2007 WL 831802, at *12; Megibow v. Commissioner, T.C. Memo. 2004-41, 2004 WL 309153, at *7.

We agree with respondent that the Form 11661 is not cumulative, is material to the penalty issues in this case, and probably would change the outcome. See Butler v. Commissioner, 114 T.C. at 287.  Reopening the record here serves the interests of justice because the record was closed in this case before we issued

[*43] <u>Graev III</u> and because petitioners never raised section 6751(b)(1) as an issue before the record was closed.  We also agree with respondent that the Form 11661 is a record kept in the ordinary course of business activity and is authenticated by the declarations.  <u>See</u> Fed. R. Evid. 803(6), 902(11).  This form is the type of evidence we routinely admit at trial solely on the basis of declarations such as those proffered.

Petitioners objected to the granting of respondent's motion but did not point to any specific issues or errors with respect to the Form 11661.  Rather, petitioners argue that because <u>Chai</u> was decided six weeks before trial and section 7491(c) has long put the burden of production on the Commissioner with respect to penalties, respondent should have known that he needed to put on this evidence at the time of trial.  Petitioners also objected on equitable grounds, arguing that respondent acted in bad faith by objecting to petitioners' motion for continuance, that petitioners were prejudiced by proceeding pro sese, and that respondent proceeded in bad faith by making evidentiary objections at trial and technical legal arguments on brief.  We disagree.  While the Court of Appeals for the Second Circuit did publish its opinion in <u>Chai</u> a short time before the trial in these consolidated cases, it was not binding in the Ninth Circuit and contradicted this

**[*44]** Court's own precedent in <u>Graev II</u>. We do not expect parties to anticipate when this Court will overrule its precedent.

Petitioners' equitable arguments are particularly weak. Petitioners were granted two continuances in these cases, giving them two additional <u>years</u> to prepare for trial. While the Court is sympathetic to health problems faced by petitioners' former attorney, those health problems had been noted in the second motion for continuance and do not excuse the lack of progress in these cases over the two years they were continued. Objecting to a motion for continuance does not constitute bad faith, nor do evidentiary objections or technical arguments. We found Mr. Benavides to be a trained tax professional capable of representing himself and BCO, and on the basis of his trial testimony we concluded that he understood substantiation requirements. And while we reject his stripping argument, that argument confirms that he understands the tax rules that we applied above.

For the reasons stated above, we believe that justice favors exercise of our discretion to reopen the record. We therefore will grant respondent's motion in part and reopen the record and admit the Form 11661 into evidence. We also will admit the declarations into evidence for the purpose of authentication under rule 902(11) of the Federal Rules of Evidence. See <u>Clough v. Commissioner</u>, 119 T.C.

**[*45]** 183, 190-191 (2002).  (As we explain below, we also will deny respondent's motion in part and will not admit the Penalty Approval Form.)

### 1.  Supervisory Approval for Mr. Benavides

The Form 11661 evinces supervisory approval for the section 6663(a) fraud penalties before the formal communication of the initial determination to assess these penalties against Mr. Benavides.  See Clay v. Commissioner, 152 T.C. __, __ - __ (slip op. at 44-45) (Apr. 24, 2019).  The Form 11661 was signed by the examining agent's supervisor before the first RAR was issued to petitioners and expressly contemplated that a 30-day letter would be prepared at some point.  On the record before us we conclude that the approval came before respondent sent to BCO or petitioners any formal communication of penalties.  Id.  We, therefore, hold that respondent has satisfied his burden of showing supervisory approval under section 6751(b)(1) for the section 6663(a) fraud penalties determined against Mr. Benavides.  See Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. __, __ - __ (slip op. at 17-18) (Feb. 28, 2019).

### 2.  Supervisory Approval for Mrs. Benavides

With respect to Mrs. Benavides, however, we held above that respondent has not carried his burden of showing by clear and convincing evidence that she had fraudulent intent.  Therefore, we need not address compliance with section

[*46] 6751(b)(1).  The Penalty Approval Form will not change the result as to

Mrs. Benavides, and it is cumulative as to Mr. Benavides.  We therefore will deny

respondent's motion in part and not admit the Penalty Approval Form into the

record.

### 3.  Supervisory Approval for BCO

Respondent does not bear the burden of showing compliance with section

6751(b)(1) for the section 6663(a) fraud penalties determined against BCO

because BCO is a corporation, not an individual.  See sec. 7491(c); Dynamo

Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 231-232 (2018).

Nevertheless, with his motion to reopen the record respondent offered a similar

Form 11661 for the section 6663(a) fraud penalties determined against BCO that

was signed by the examining agent's supervisor before an RAR was issued to

BCO.  The Form 11661 was authenticated by the same declarations we have

admitted into the record.  It is not clear from the record whether BCO put

supervisory approval under section 6751(b)(1) in issue, but we will deem BCO to

have done so.  We will therefore admit the Form 11661 into the record for

purposes of showing requisite supervisory approval of the initial determination to

assess the section 6663(a) penalties determined against BCO.  On the basis of this

**[*47]** Form 11661 and the declarations we have already admitted, we hold that respondent complied with section 6751(b)(1) with respect to BCO.

### C. Summary

Because respondent has shown by clear and convincing evidence that the underpayments attributable to the diverted gross receipts for each of the tax years in issue are attributable to fraud, we sustain respondent's determinations imposing fraud penalties under section 6663(a) on BCO's and Mr. Benavides' underpayments of tax relating to diverted gross receipts.[6] With respect to Mrs. Benavides, however, respondent failed to show by clear and convincing evidence that she had fraudulent intent; therefore, Mrs. Benavides is not liable for the section 6663(a) fraud penalties. See sec. 6663(c).

## V. Limitations

Finally, petitioners also raise a statute of limitations argument, asserting that because respondent's fraud allegation is limited to underpayments of tax

---

[6] Respondent determined that some portions of the underpayments of tax by petitioners were not attributable to fraud and did not determine fraud penalties on those amounts. These portions are attributable to the various disallowed deductions flowing from Sunrise to petitioners that increased Sunrise's income. As we explain below, the mere fact that respondent determined that only a portion of the underpayments was attributable to fraud (the constructive dividends resulting from diverting BCO's gross receipts) does not mean that respondent is barred by the statute of limitations from assessing the portions of the underpayments that were not attributable to fraud.

[*48] attributable to the gross receipts diverted from BCO, the other deficiencies are outside the limitations period. A deficiency in tax generally must be assessed within three years from the date on which the return was filed. See sec. 6501(a). However, if a taxpayer files a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time. Sec. 6501(c)(1). And in the case of a joint return, fraud by either taxpayer suspends the period of limitations indefinitely for both taxpayers. See Ballard v. Commissioner, 740 F.2d 659, 663 (8th Cir. 1984), aff'g in part and rev'g in part T.C. Memo. 1982-466; Hicks Co. v. Commissioner, 56 T.C. at 1030; Evans v. Commissioner, T.C. Memo. 2010-199, 2010 WL 3564727, at *5, aff'd, 507 F. App'x 645 (9th Cir. 2013).

Respondent bears the burden of proving by clear and convincing evidence that this exception to the limitations period applies. See Gould v. Commissioner, 139 T.C. 418, 431 (2012), aff'd, 552 F. App'x 250 (4th Cir. 2014). Respondent's burden is the same as his burden under section 6663(a) to prove the applicability of the fraud penalty: Respondent must show that there is an underpayment of tax for each year, and that some portion of each underpayment is attributable to fraud. Id. As discussed above, respondent has carried his burden under section 6663(a) as to both BCO and Mr. Benavides. Therefore, we hold that he has carried his burden under section 6501(c)(1) with respect to BCO and petitioners.

**[*49]** Because the limitations period has not closed with respect to the tax years in issue, respondent may assess and collect the tax he determined to be owing for those years, whether or not attributable to fraud. See sec. 6501(c)(1); Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961) ("[I]f a return be fraudulent in any respect with intent to evade a tax, it deprives the taxpayer of the bar of the statute for that year, and permits a general reaudit of the return throughout, and will toll the Statute of Limitations on the reaudit of any item of the tax."), aff'g T.C. Memo. 1960-32.

## VI. Conclusion

In sum, because we found clear and convincing evidence of fraud with respect to BCO's diverted gross receipts for each year in issue, respondent's deficiency determinations set forth in the notices of deficiency may be assessed against both BCO and petitioners, except that the section 6663(a) fraud penalties may not be assessed separately against Mrs. Benavides.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

**[\*50]**  To reflect the foregoing,

An appropriate order and decisions will be entered.